**2018-1606**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

ATEN INTERNATIONAL CO., LTD.,
*Plaintiff-Appellant*,

v.

UNICLASS TECHNOLOGY CO., LTD, ELECTRONIC TECHNOLOGY CO., LTD., AIRLINK 101, PHOEBE MICRO, INC., BROADTECH INTERNATIONAL CO., LTD. D/B/A LINKSKEY, BLACK BOX CORPORATION, BLACK BOX CORPORATION OF PENNSYLVANIA,
*Defendants-Appellees*.

---

Appeal from the U.S. District Court for the Central District of California in *ATEN International Co., Ltd., v. Uniclass Technology Co. Ltd.*, *et al.,* Civil Action No. 2:15-cv-04424-AG-AJW, Judge Andrew J. Guilford.

---

**OPENING BRIEF OF APPELLANT**
**ATEN INTERNATIONAL CO., LTD.**

---

Laurence M. Sandell
Lei Mei
MEI & MARK LLP
818 18th Street NW, Suite 410
Washington, DC 20006
Telephone: (888) 860-5678 x717
lsandell@meimark.com

*Attorneys for Appellant ATEN International Co., Ltd.*

April 27, 2018

## CERTIFICATE OF INTEREST

Counsel for Appellant certify as follows:

1. The full name of every party or amicus represented by us is:

   ATEN International Co., Ltd.

2. The names of the real parties in interest represented by us are:

   ATEN International Co., Ltd.

3. All parent corporations and any public companies that own 10 percent or more of the stock of the parties represented by us are:

   None

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this Court are:

   - Freeman A Mark, Irene H Chen, Manni Li & Philip Andrew Riley of Mei and Mark LLP;
   - Michael A Siem & Timothy Devlin of Devlin Law Firm LLC;
   - Andrew G Pearson, Christopher R Dillon, Craig E Countryman, Jane J Du, & Whitney A Reichel of Fish and Richardson PC;
   - Anthony J Tartaglio of Orrick Herrington and Sutcliffe LLP;
   - E Robert Yoches of Finnegan Henderson Farabow Garrett and Dunner LLP;
   - Grace L Pan & R David Donoghue of Holland and Knight LLP;
   - Kuan-Hsun Chiu & Laurence Kao of OPES Law PC;
   - Seth W Wiener of Law Offices of Seth Wiener; and
   - Steven Robert Daniels of Farney Daniels PC.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal (*see* Fed. Cir. R. 47.4(a)(5) and 47.5(b)) are:

   None

April 27, 2018

/s/ Laurence M. Sandell
Laurence M. Sandell

# TABLE OF CONTENTS


Page

STATEMENT OF RELATED CASES ........ x

STATEMENT OF JURISDICTION ........ xi

I. STATEMENT OF THE ISSUES ........ 1

II. STATEMENT OF THE CASE ........ 3

A. The Patents at Issue ........ 3

i. The ’141 Patent ........ 3

ii. The ’289 Patent ........ 4

B. Claim Construction ........ 8

C. Uniclass’ Motion for Summary Judgment on Lost Profits ........ 9

D. Trial ........ 11

i. The Trial Record on the ’141 Patent ........ 13

ii. The Trial Record on the ’289 Patent ........ 18

E. ATEN’s Partially Denied JMOL Motion ........ 22

III. SUMMARY OF ARGUMENT ........ 24

IV. ARGUMENT ........ 27

A. Legal Standards ........ 27

B. The ’141 Patent Invalidity Verdict Is Not Supported by Substantial Evidence ........ 29

i. There is No Evidence that the CS-1762 Antedates the Critical Date ........ 29

ii. Uniclass Offered Only Conclusory Statements Regarding Alleged Anticipation by GB ’540 ........ 32

C. The Jury’s Noninfringement Verdicts Are Unsupported by Substanial Evidence and Irredeemably Tainted by Uniclass’ Expert’s Claim Construction Testimony ........ 35

i. The District Court Unfairly Prejudiced ATEN and Abused Its Discretion by Erroneously Permitting Mr. Dezmelyk's Claim Construction Testimony to Stand Without Corrective Jury Instruction ........................................35

ii. ATEN Is Entitled to JMOL of Infringement of the '141 Patent ........................................46

iii. ATEN Is Entitled to JMOL of Infringement of the '289 Patent ........................................53

D. Summary Judgment on Lost Profits Damages Should Be Reversed........................................58

i. The District Court Erroneously Based its Unsound-Economic-Principles Finding on Mr. Snell's Reliance on Mr. Chen's Statements ........................................59

ii. The District Court Erroneously Based its Unsound-Economic-Principles Finding on Mr. Snell's Alleged Failure to Properly Account For "Other Competitors" ............61

V. CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................65

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................64

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ........................................................ 60, 62-63

*Aqua Products, Inc. v. Matal*,
872 F. 3d 1290 (Fed. Cir. 2017) ........................................................ 29, 31-32

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013) ........................................47-49, 52-54, 57-58

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................58, 64

*Chiron Corp. v. Genentech*, Inc.,
363 F.3d 1247 (Fed. Cir. 2004) ........................................................ 27-28, 41

*Comaper Corp. v. Antec, Inc.*,
596 F.3d 1343 (Fed. Cir. 2010) ........................................................42

*Cordance Corp. v. Amazon.Com Inc.*,
658 F.3d 1330 (Fed. Cir. 2011) ................................................29, 37, 44, 56

*Cordis Corp. v. Boston Scientific Corp.*,
561 F.3d 1319 (Fed. Cir. 2009) ........................................................28, 35, 53

*Cytologix Corp. v. Ventana Medical Systems, Inc.*,
424 F.3d 1168 (Fed. Cir. 2005) ................................................ 35-36, 38, 41

*Del Mar Avionics, Inc. v. Quinton Instr. Co.*,
836 F.2d 1320 (Fed. Cir. 1987) ........................................................ 58-59

*Eon Corp. v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016) ........................................................ 36-37

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ........................................49, 51, 52, 54, 56

*Flores v. City of Westminster*,
873 F.3d 739 (9th Cir. 2017)....28, 42

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999)....63

*Gaus v. Conair Corp.,*
363 F.3d 1284 (Fed. Cir. 2004)....43, 45

*Hagen v. City of Eugene*,
736 F.3d 1251 (9th Cir. 2013)....46, 53, 58

*Harris Corp. v. Ericsson Inc.*,
417 F.3d 1241 (Fed. Cir. 2005).... 42-43, 46

*House v. Bell*,
547 U.S. 518 (2006)....63

*HSM Portfolio LLC v. Elpida Memory Inc.,*
160 F. Supp. 3d 708 (D. Del. 2016).... 37-38

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.,*
87 F.Supp.3d 928 (N.D. Cal. 2015)....37

*In Re Hodges*,
882 F.3d 1107 (Fed. Cir. 2018)....35

*Jones v. Hardy*,
727 F.2d 1524 (Fed. Cir. 1984)....29, 31

*Kaufman Co. v. Lantech, Inc.*,
926 F.2d 1136 (Fed. Cir. 1991)....58

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004)....32

*Laitram Corp. v. Cambridge Wire Cloth Co.*,
863 F.2d 855 (Fed. Cir. 1988)....44

*LifeNet Health v. LifeCell Corp.,*
837 F.3d 1316 (Fed. Cir. 2016)....36, 43, 45, 49

*MediaTek Inc., v. FreeScale Semiconductor, Inc.*,
Case No. 11-cv-5341, 2014 U.S. Dist. LEXIS 31461 (N.D. Cal. Mar. 5, 2014) ....................51

*Metso Minerals, Inc. v. Powerscreen Int'l Dist, Ltd.*,
526 Fed. Appx. 988 (Fed. Cir. 2013) ....................41

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
690 F.3d 1354 (Fed. Cir. 2012)....................31

*Micro Chem., Inc. v. Lextron, Inc.*,
318 F.3d 1119 (Fed. Cir. 2003)....................28

*Nelson v. Adams USA, Inc.,*
529 U.S. 460 (2000) .................... 43, 45-46

*Nobelbiz, Inc. v. Glob. Connect, L.L.C.*,
No. 6:12-CV-244-RWS, 2015 U.S. Dist. LEXIS 179377 (E.D. Tex. July 16, 2015)....................37

*Nobelbiz Inc. v. Global Connect, LLC*,
701 Fed. Appx. 995 (Fed. Cir. 2016) ....................35, 38

*Nobelpharma AB v. Implant Innovations, Inc*.,
141 F.3d 1059 (Fed. Cir. 1998)....................47, 52, 57

*Norsk Hydro Canada, Inc. v. U.S.,*
472 F.3d 1347 (Fed. Cir. 2006)....................43

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....................35, 40

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996)....................59

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014)....................49

*Panduit Corp. v. Dennison Mfg. Co.,*
810 F.2d 1561 (Fed. Cir. 1987)....................35

*Parkervision, Inc. v. Qualcomm Inc.,*
621 Fed. Appx. 1009 (Fed. Cir. 2015) .................... 47-48

*Pfaff v. Wells Elecs., Inc.*,
525 U.S. 55 (1998) ....................................................................................29

*Poly-America, L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ................................................. 49-51, 55, 56

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
536 F.3d 1256 (Fed. Cir. 2008) ....................................................................48

*Reeves v Sanderson Plumbing Products*,
530 U.S. 133 (2000) ........................................................................ 46-47, 55

*Rite-Hite Corp. v. Kelley Co., Inc.*,
56 F.3d 1538 (Fed. Cir. 1995) ......................................................................59

*Schumer v. Lab. Comp. Sys., Inc.*,
308 F.3d 1304 (Fed. Cir. 2002) ........................................................ 32-34, 58

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004) ....................................................................36

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ....................................................................33

*Sundance, Inc. v. DeMonte Fabricating Ltd.,*
550 F.3d 1356 (Fed. Cir. 2008) ....................................................................40

*TVIIM, LLC v. McAfee, Inc.,*
851 F.3d 1356 (Fed. Cir. 2017) .................................................27, 32, 34, 43

*Typeright Keyboard Corp. v. Microsoft Corp.*,
374 F.3d 1151 (Fed. Cir. 2004) ............................................................. 28-32

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.,*
824 F.3d 1344 (Fed. Cir. 2016) .............................................................36, 39

*Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*,
522 F.3d 1348 (Fed. Cir. 2008) ............................................................. 37-38

## STATUTES

28 U.S.C. § 1295 .......................................................................................... xi

28 U.S.C. § 1331 .......................................................................................... xi

28 U.S.C. § 1338 .......................................................................................... xi

35 U.S.C. § 102 ..............................................................................................29

35 U.S.C. § 282 ..............................................................................................29

## OTHER AUTHORITIES

Fed. Cir. R. 47.5 ..............................................................................................x

Fed. R. Civ. P. 26 ............................................................................................42

Fed. R. Civ. P. 56 ...........................................................................28, 58, 64

Fed. R. Evid. 703 ............................................................................................60

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Counsel for Appellant certifies that no other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

## STATEMENT OF JURISDICTION

This is an appeal from the U.S. District Court for the Central District of California's Order denying, in part, ATEN International Co. Ltd.'s ("ATEN") renewed motion for Judgment as a Matter of Law ("JMOL"), or alternatively for a new trial, Appx1-13; Judgment for Uniclass Technology Co., Ltd. ("Uniclass Tech."), Electronic Technology Co., Ltd., Airlink 101, Phoebe Micro, Inc., Broadtech International Co., Ltd. d/b/a Linkskey, Black Box Corporation, and Black Box Corporation of Pennsylvania (collectively, "Uniclass"), Appx14-17; and summary judgment on lost profits, Appx18-23. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). ATEN filed a timely notice of appeal, Appx8187-8189, and this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

# I. STATEMENT OF THE ISSUES

(1) Whether substantial evidence supports anticipation where:

(i) the accused infringer provided no evidence that the patentee's own device predated the critical date; and

(ii) as to the only other asserted reference, the accused infringer offered only conclusory expert testimony as to one claim limitation, which was rebutted by detailed undisputed testimony by the patentee's expert.

(2) Whether a new trial on infringement is warranted where:

(i) the district court declined to strike testimony or otherwise give a limiting jury instruction after Uniclass' expert testified on "ordinary meaning" terms with a "wrong" ATEN "claim construction" and Uniclass' "correct claim construction that ... results in infringement"; and

(ii) the jury entered irreconcilably inconsistent special verdicts.

(3) Whether substantial evidence supports noninfringement of U.S. Patent No. 8,589,141 ("the '141 patent"), where:

(i) satisfaction of the disputed claim elements turns on whether the "ordinary meaning" of "connecting" excludes indirect connections from claim scope;

(ii) Uniclass' narrow interpretation of "connecting" was grounded in expert opinion that ATEN disavowed claim scope in the prosecution history; and

(iii) under ATEN's interpretation—which Uniclass conceded was adopted by the jury—there is no substantive dispute that the accused devices satisfied the disputed elements.

(4) Whether substantial evidence supports noninfringement of U.S. Patent No. 7,640,289 ("the '289 patent"), where:

(ii) satisfaction of the disputed claim elements turns on whether the "ordinary meaning" of "detecting whether the first port is occupied" excludes detecting occupation by detecting messages received through the port;

(iii) Uniclass' narrow interpretation of "detecting" was grounded in expert opinion that ATEN disavowed claim scope in the specification and the prosecution history; and

(iv) under ATEN's interpretation, the accused devices undisputedly practice the disputed claim elements in at least some instances.

(5) Whether the district court erred in excluding lost profits on summary judgment.

## II. STATEMENT OF THE CASE

### A. The Patents at Issue

#### i. The '141 Patent

The '141 patent, which ATEN asserted against Uniclass'[1] Prima T and "A"[2] products, is directed to technology for

> switching between computers that are sharing a keyboard, monitor, and mouse through a KVM[3] switch.... The invention of the '141 patent allows someone to use a keyboard shortcut (or an analogous function on some other input device) to switch between computers.

Appx1868. *See generally* Appx24-35. Claim 1 is representative and recites:

> [1.0] A method for controlling a resource sharing apparatus coupling at least one input device to a plurality of hosts including a first host, the method comprising:
>
> [1.1] **connecting the input device to the first host**;
>
> [1.2] while **the input device is connected to the first host**, acquiring a first input signal from the input device and determining whether the first input signal comprises a standby indication of a switch command

[1] ATEN maintains its substantially identical infringement assertions against the devices that directly correspond to the accused Uniclass products, but are sold or marketed by other defendant-appellees. *E.g.,* Appx8464 at 53:2-11; Appx8959 at 9:18-25; Appx8965-8969 at 15:17-19:25.

[2] "A" products collectively refers to the following Uniclass devices: AD-202A, AD-204A, AH-202A, AH204A, AD-CP02, AD-EP04A, AH-832A, AH-834A, AI-832A, AI-834A, AL-832A, AL-834A, AP-832A, AP-834A, AD-702D, AD-704D, AD-702V, AD704V, AL-702D, AL-704D, AD-502D, AD-504D, AD-502V, AD-504V. Appx8699-8707 at 91:3-99:19. For the purposes of this appeal, the "A" products are addressed collectively with the Prima T devices because the parties agree that infringement of the '141 patent by these accused products rises and falls together. Appx9255-9256 at 129:10-17, 130:4-13.

[3] "KVM" stands for keyboard, video, and mouse, respectively. *E.g.,* Appx8458-8459 at 47:15-48:3.

> and wherein the standby indication is for indicating that connection between the input device and the first host can be changed; and
>
> [1.3] in response to a determination that the first input signal comprises the standby indication, disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host; and
>
> [1.4] acquiring a second input signal from the input device, wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus.

Appx33-34 at 8:55-9:7[4].

ATEN asserted infringement of, *inter alia*,[5] claim 3, which depends from claims 1 and 2, and claim 8, which depends from claim 1. Appx8310 at 121:16-21; Appx8463 at 52:18-24. Uniclass asserted that the ’141 patent was invalid under two anticipation theories: First, it contended that the CS-1762, ATEN’s own KVM device, practiced the asserted claims and predated the critical date. Appx4. Second it asserted anticipation by Great Britain Patent No. 2,352,540 (“GB ’540”). *Id.*

**ii. The ’289 Patent**

The ’289 patent, which ATEN asserted against the Prima T products, is directed to technology for “stringing several KVM switches together.”

> The invention … provides that each KVM switch can detect whether it is a master or slave. The switch does this by detecting whether the port on the device used to connect other KVM switches is occupied. So, for example, a master might became a slave if a new master is

[4] *See* Appx8717-8729 for element numbering.
[5] To simplify issues on appeal, ATEN does not appeal noninfringement of claim 10. ATEN appeals invalidity as to all claims.

plugged into it.

Appx1867. In modified Figure 1, below, the master switch is depicted in blue, the slave switches are depicted in yellow, input port 11 (the first port) is depicted in brown, and output port 12 (second port) is depicted in red.




Appx37.

Claim 1 is representative and recites:

[1.0-1.3] A computer switch comprising:
a set of peripheral device ports for connecting to a set of peripheral devices;
a first port;
a second port;

[1.4] a control device coupled to the first port and the second port, [1.5] the control device **repeatedly detecting whether the first port is occupied** to repeatedly determine a master or slave status of the computer switch, [1.6] **wherein if the first port is occupied**, the

> control device determines the computer switch to be a slave [1.7] and provides data to a first external computer switch connected to the first port, and [1.8] **<u>if the first port is unoccupied</u>**, the control device determines the computer switch to be a master and controls a second external computer switch connected to the second port and obtains data from the second external computer switch;
>
> [1.9] and a plurality of computer connection ports coupled to the control device for connecting to and controlling a plurality of computers, [1.10] wherein the plurality of computers are controlled by the set of peripheral devices if the computer switch is determined to be a master, and [1.11] are controlled by the first external computer switch connected to the first port if the computer switch is determined to be a slave.

Appx42 at 5:24-51[6] (emphasis added). The parties' dispute on the '289 patent turns on the meaning of "detecting whether the first port is occupied" and correlated claim elements.

The patent explains that "the intelligent computer switch detects whether or not a series connection cable is connected to the input port," but offers no mechanism for accomplishing this other than by "waiting for the master command"—and ultimately receiving a message through the port. Appx41 at 4:36-38, 4:57-61. *Contra* Appx9326 at 200:5-7.

Figure 3, below, is "a flow chart to describe the work process of the intelligent computer switches" of the '289 patent. Appx39; Appx40 at 2:59-61.

[6] *See* Appx8567-8591 for element numbering.




As shown, step 670 "waiting for command from Master [from the Input port]" precedes step 620, which determines whether the input port is connected to a cable in at least some instances. Appx9484-9486 at 122:18-124:14.

ATEN asserted infringement of claims 1-20. Appx8310 at 121:16-21;

Appx8463 at 52:2-8.[7]

### B. Claim Construction

Prior to trial, the court construed several terms of, *inter alia,* the '141 patent. *See generally* Appx1864-1882. Uniclass sought to have "disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host" (element 1.3) construed as

> Breaking the direct communication pathway between the input device and the host and then establishing a direct communication pathway between the host and the emulator.

Appx1387 (emphasis added); Appx9618. ATEN argued that the "plain and ordinary meaning" of the phrase should govern. *Id.* In its *Markman* ruling, the court agreed with ATEN, rejecting Uniclass' attempt to import a "direct" requirement into the claim, and noting that such term appears "nowhere in the '141 patent." Appx1879-1880.

Additionally, Uniclass requested that the disembodied terms "connect" and "disconnect" be construed to explicitly incorporate the same "direct" requirement. Appx1389-1390. Uniclass, however, failed to comply with instructions regarding the number of terms that it was permitted to seek construction of. Appx1871.

---

[7] The sole disputed issue of infringement—occupation detection—is exemplified in claim 1 and infringement regarding claims 2-20 rises and falls with this dispute. *See* Appx9232-9234 at 106:15-108:17. To simplify the appeal, ATEN focuses on representative claim 1.

Accordingly, the court declined to substantively address "connect"/ "disconnect" and left the terms with their ordinary meaning—*i.e.,* implicitly not requiring that "connecting" be "direct." Appx1871.

### C. Uniclass' Motion for Summary Judgment on Lost Profits

Before trial, Uniclass filed a motion for summary judgment to preclude ATEN's pursuit of lost profits damages. Appx4515-4540. Uniclass offered two primary arguments: (1) ATEN's damages expert—Mr. Jeffrey Snell—allegedly failed to make an adequate market-share analysis; and (2) ATEN allegedly could not satisfy *Panduit*'s second factor, the absence of noninfringing alternatives. Appx4526-4533; Appx20. The district court granted summary judgment, finding that "ATEN did not undertake a meaningful market analysis that would support a lost profits calculation." Appx20.[8]

Regarding ATEN's lost profits claim against Uniclass Tech.[9], the court stated: "Uniclass and ATEN are not the only KVM switch manufacturers that compete in the KVM switch OEM[10] market in the United States." Appx21. After

[8] In view of this ruling, the district court declined to substantively address Uniclass' argument (2) regarding noninfringing alternatives. Appx23.

[9] ATEN is not appealing summary judgment against Appellees other than Uniclass Tech. *See* Appx23.

[10] "OEM" stands for "original equipment manufacturer." It refers to a manufacturer who sells its products to a distributor, a third party company that brands and sells them. Appx8883-8884 at 94:4-95:8.

noting Mr. Snell's statement that he "ha[d] not been able to identify market share data that would allow [him] to estimate the portion of sales that ATEN would have made," it characterized his analysis:

> To address the lack of actual market share data, Snell uses an "alternative method" to estimate the portion of accused sales that ATEN would have allegedly made. With the help of the Head of ATEN's OEM department, C.H. Chen, he "mapped" ATEN products to corresponding accused Uniclass products. In Snell's expert report, he states, "[f]or accused products that were mapped to ATEN products, I assumed that ATEN likely would have made these sales based on my understanding from Mr. Chen, who indicated that ATEN and Uniclass have been the dominant suppliers in [the U.S. KVM OEM market]." In essence, Snell equates his nomenclature of "dominant suppliers" with a "two-supplier" market without independent support and makes an assumption that ATEN's actual products are sufficiently similar to Un[i]class's products that they may be swapped in the marketplace.

Appx21-22 (citations omitted). The court found that Mr. Snell's "approach does not embody the use of sound economic principles because it does not properly account for the other competitors in the 'but for' market" and incorporated "multiple layers of guesswork." Appx22.

Likewise, the district court found that "ATEN's mapping theory suffers from the same flaws as its two-supplier market theory," in that Mr. Snell "relied solely on ATEN['s witness Mr. Chen] to decide which of ATEN's products are sufficiently similar to Uniclass products to essentially swap them out in the market." *Id*. It found that ATEN's mapping "assumes that no other OEMs have similar products." *Id*.

Ultimately, the district court held that "ATEN has not met its burden to provide a basis for concluding that any sales of Defendants would be sales of ATEN in the 'but for' market" and thus "cannot meet the reasonable probability standard for establishing lost profits." Appx23.

**D. Trial**

A jury trial began on September 19, 2017. Appx1-2. The jury heard testimony from ATEN's technical expert, Tal Lavian, Ph.D., and Uniclass' technical expert, Mr. Robert Dezmelyk.

Mr. Dezmelyk testified on noninfringement and invalidity; he also "offered an opinion on what the scope of the claim terms are." Appx9328 at 202:17-18. Regarding disputed elements of both the '289 patent and the '141 patent he told the jury that there were multiple claim constructions: "the correct claim construction that I've presented that results in noninfringement" and "ATEN's view of the claim terms," which he considered a "wrong" "claim construction." Appx9317 at 191:2-6, 191:16-25; Appx9355 at 229:2-3; Appx9334 at 208:16-18. He explicitly testified that, as to the '141 and '289 patents, noninfringement and invalidity were mutually exclusive:

> [F]or the '289 patent, claims one to twenty are invalid under ATEN's view of the claim term occupied. And as I said, they are not invalid as far as I know, given the prior art we have in this case, over a correct construction of the claim.
>
> In the case of claims three, eight, and ten of the '141 patent, they are

> invalid under ATEN's view of the claim terms connected, but they are not as far as I know, based on the prior art in this case, invalid under a proper construction of the claim.

Appx9317 at 191:16-25 (emphasis added); Appx9316-9317 at 194:4-191:6; Appx9354-9355 at 228:7-229:5; *see also* Appx9334-9335 at 208:14-209:7.

At the conclusion of Mr. Dezmelyk's testimony—and long before the jury was charged—ATEN lodged an objection. Initially articulated as "post-testifying Daubert on Mr. Dezmelyk's testimony on invalidity with respect to anything that required an ATEN claim construction," ATEN's oral motion pursued a remedy to ensure that "only one claim construction … be applied both equally to the invalidity side of the case as well as to an infringement side of the case." Appx9357-9358 at 231:23-232:6. ATEN's counsel explained that Mr. Dezmelyk improperly testified that there are "two claim constructions," including "ATEN's claim construction," and "that's going to confuse the jury." Appx9359-9360 at 233:25-234:18. The Court took these issues "under submission" but took no action to strike or otherwise give a limiting instructing the jury regarding Mr. Dezmelyk's claim construction testimony. Appx9360 at 234:19-20; Appx9366 at 4:18-21.

At the close of Uniclass' case, ATEN unsuccessfully moved for JMOL on, *inter alia,* the appealed issues. Appx1-2. *See* Appx7933-7940. After several days of deliberation, the jury found, in a special verdict, that the '141 patent was not

infringed and invalid as anticipated; and that the ’289 patent was not infringed. Appx2; Appx9765-9771; *e.g.*, Appx9610 at 248:2-3;

### i. The Trial Record on the ’141 Patent

#### *1. Infringement*

ATEN, through Dr. Lavian, offered evidence that asserted claims 3 and 8 of the ’141 patent were infringed. Dr. Lavian began by conceptually explaining the claimed invention[11]; introducing the accused devices—as well as their product manuals, specifications, and other documentary evidence[12]; and explaining the evidentiary sources of his opinions[13]. Then, Dr. Lavian addressed each claim element; explained his understanding of it; and, with reference to exemplary documentary evidence, explained why he believed it was satisfied.[14]

[11] Appx8688-8697 at 80:22-89:21.

[12] Appx8697-8699 at 89:25-91:1 (Prima T devices); *see also* Appx8557-8559 at 55:13-57:17 (earlier testimony regarding Prima T); Appx8699-8707 at 91:3-99:19(“A” devices).

[13]Appx8708-8709 at 100:12-101:14; *see also* Appx8466-8486 at 55:8-75:14.

[14]Appx8717-8719 at 3:1-5:5 (element 1.0); Appx8719-8721 at 5:6-7:12 (1.1); Appx8721-8725 at 7:14-11:4 (1.2), Appx8725-8728 at 11:5-14:16 (1.3), Appx8728-8731 at 14:17-17:20 (1.4); Appx8733-8735 19:8-21:22 (element 9.1); Appx8740 at 26:2-14 (noting equivalence of claim 2 and element 9.1); Appx8740-8745 at 26:18-31:18 (claim 3); Appx8745-8748 at 31:22-34:3 (claim 8); *see also* Appx8748-8749 at 34:15-35:4 (establishing that following Uniclass’ manuals would perform the claimed methods).

Uniclass contested infringement through Mr. Dezmelyk's opinion testimony that elements 1.1 and 1.2 of claim 1 were not present in the accused devices. Appx9252-9256 at 126:1-127:6 (Prima T), 127:25-130:2 ("A" devices). In short, he testified that the accused devices do not meet elements 1.1 and 1.2 because they "never connect the input device to the host computer." Appx9237 at 111:15-16 (emphasis added).

Importantly, and consistent with his expert report, Mr. Dezmelyk declined to contest that any other element of dependent asserted claims 3 and 8 was satisfied—including element 1.3. *E.g.,* Appx9252-9253 at 126:1-127:6 (showing a slide with claim 1 to the jury and only contesting elements 1.1 and 1.2); Appx6958-6999.

Its proposed constructions requiring a "direct communication pathway" having been previously rejected, Appx1871, Appx1878-1880, Uniclass sought an equivalent construction at trial *de facto* by arguing that the "plain and ordinary meaning" of "connecting" excludes connection via intermediaries, such as a chip that also provides the claimed emulation. Appx9241 at 115:18-22. Mr. Dezmelyk explained his "test … for when we don't have an input device connected is we're talking to an emulator, not the input device." Appx9241 at 115:15-17 (emphasis added); *see also* Appx9240 at 114:4-6.

Notably, Mr. Dezmelyk did not assert that "the correct claim construction that [he] presented" was based on ordinary meaning of words. Appx9317 at 191:2-

3. Rather, he took the jury on a journey through the prosecution history, arguing that ATEN disavowed claim scope to have the jury import a "direct" requirement into ordinary meaning term. Appx9242-9247 at 116:11-121:16. He purported to explain the patentee's prosecution history arguments and compared the application's claims to four separate prior art reference that were considered during prosecution, but not asserted by Uniclass at trial. *Id.*

Ultimately, he told the jury, "the correct claim construction that I've presented that results in noninfringement," and distinguished this alleged "proper construction" from "Dr. Lavian's claim construction." Appx9316-9317 at 190:4-191:25**;** Appx9334 at 208:16.

While Mr. Dezmelyk testified that there is never an "active connection" or "actual connection" between the input devices and the host, there is no dispute that the accused devices transfer input device data to the host. Appx9252 at 126:9-13; Appx9242 at 116:8-9. For example, Mr. Dezmelyk admitted, "if I type my name into the keyboard in one of these accused KVM devices, it would go to the host." Appx9332 at 206:23-25; *see also* Appx9247 at 121:17-25. Under cross-examination, he clarified that his "no connection" conclusion resulted from indirectness in the undisputed input device-host data link. Appx9332 at 206:18-22.

After the district court overruled ATEN's objection to Mr. Dezmelyk's testimony, Dr. Lavian rebutted Mr. Dezmelyk's prosecution history-based claim scope disavowal arguments. Appx9490-9493 at 128:11-131:16.

### *2. The CS-1762 Anticipation Theory*

Mr. Dezmelyk relied on two sources to assert anticipation by the CS-1762. For certain claim elements, he relied on a June 4, 2004, CS-1762 device manual. Appx9303-9305 at 177:8-179:11; Appx9307-9311 at 181:10-185:7. He admitted that neither element 1.3 nor element 1.4 was "disclosed by the manual." Appx9337-9338 at 211:4-212:1; *see also* Appx33-34 at 8:66-9:7; Appx8725 at 11:5-20; Appx8728-8729 at 14:17-15:3. For these missing elements, he exclusively relied upon on his testing of a CS-1762 from 2009. Appx9311-9316 at 185:8-190:13; Appx9338 at 212:2-4.

Without any corroborating documents, Mr. Dezmelyk testified that the 2009 device operated using firmware from 2006. Appx9338 at 212:8-17. Notwithstanding that Mr. Dezmelyk agreed that the critical date for the '141 patent was July 24, 2006, he declined to offer any date or even month in 2006 when such firmware was allegedly released. Appx9302-9303 at 176:22-177:3; Appx9338 at 212:18-25; *accord* Appx4. The record contained no other evidence on this factual issue. *See* Appx9505-9506 at 143:4-144:1.

Additionally, regarding the additional limitations of asserted dependent claim 8, Mr. Dezmelyk's entire testimony was "[u]nder ATEN's view of the claim terms and Dr. Lavian's analysis, the limitations … are met as well." Appx9310-9311 at 184:23-185:3.

### *3. The GB '540 Anticipation Theory*

Element 1.3 of the '141 patent recites "starting emulating the input device to the first host." Appx33-34 at 8:67-9:3 (emphasis added); Appx8725 at 11:5-20.

Mr. Dezmelyk—in the context of asserted patents not at issue in this appeal and a different claim element of the '141 patent—testified that GB '540 discloses "emulating one or more of the console devices." Appx9284 at 158:4-17 (citing Appx9793), Appx9296 at 170:10-20, Appx9301-9302 at 175:20-176:6 (claim 3 of the '141 patent); *see also* Appx9285-9286 at 159:16-160:18 (discussing host emulation rather than device emulation). However, as to element 1.3, he offered no reasoning regarding how the generic emulation of GB '540 meets the requirement of "emulating…to the first host." Instead, he merely described the hot-key functionality of GB '540 and vaguely mentioned portions of GB '540 that do not refer to emulation at all. Appx9300-9301 at 174:13-175:19 (referencing Appx9789-9790). Then, he abruptly concluded that GB '540 anticipated. Appx9301-9302 at 175:20-176:13.

Dr. Lavian pointed out this deficiency to the jury, explaining that "a different type of emulation" is disclosed in GB '540, and unequivocally testified that there is "[n]ever ever emulation to the PC"—*i.e.,* the first host. Appx9500-9503 at 138:5-141:12 (citing Appx9793); *see also* Appx9493-9500 at 131:17-138:4 (overarching explanation of GB '540). Uniclass' counsel declined to cross-examine Dr. Lavian on this issue. *See* Appx9511-9529 at 149:19-167:20.

#### ii. The Trial Record on the '289 Patent

##### *1. Infringement*

Similar to the '141 patent, Dr. Lavian began by explaining the claimed invention as a whole[15]; introducing the accused devices[16]; and explaining the evidentiary sources of his opinions[17]. Regarding the relevant technical operations of Prima T devices, Dr. Lavian confirmed his understanding with a flow chart prepared by Uniclass' chief engineer. Appx8560 at 58:6-12; *see* Appx8578-8581 at 76:5-79:15; Appx9813. He addressed each claim element; explained his

[15] Appx8555 at 53:3-25; Appx8562-8567 at 60:8-65:9.

[16] Appx8557-8559 at 55:13-57:19.

[17] Appx8559-8561 at 57:20-59:1; Appx8466-8486 at 55:8-75:14.

understanding of it; and, with reference to documentary evidence, explained why it satisfied by the accused devices.[18]

Uniclass' cross-examination was limited to elements 1.5, 1.6, and 1.8: It focused on "repeatedly detecting whether the first port is occupied" of element 1.5 and referred to the other claim limitations based on their relationship to said occupation detection. Appx8817-8821 at 28:24-32:21. Dr. Lavian reiterated his opinion that slave KVMs "a[re] actually interacting with [master KVMs] to say that [the first port i]s occupied," and that such interaction is understood in the art as a "handshake." Appx8818-8820 at 29:16-31:6; *see also* Appx8820-8821 at 31:7-32:21 (identifying a reference to "the concept of talking or handshaking" in Fig. 3).

Dr. Lavian expanded on these points during his validity testimony, wherein he revisited the patent's disclosure to support that the port occupation may be detected via message communication. He explained that there are "many ways … to see physical connection," including via "optical sensor, pressure sensor, signal sensor, electrical sensor," but no such mechanisms are discussed in the '289 patent. Appx9487 at 125:12-25. Rather, in the patent, the "only one way" for "detecting

[18] *E.g.,* Appx8567-8572 at 65:11-70:21 (elements 1.0-1.3); Appx8572-8576 at 70:23-74:20 (1.4); Appx8576-8582 at 74:21-80:18 (1.5); Appx8582-8583 at 80:19-81:13 (1.6); Appx8583-8585 at 81:14-83:11 (1.7); Appx8585-8587 at 83:12-85:16 (1.8); Appx8587-8588 at 85:17-86:18 (1.9); Appx8588-8590 at 86:19-88:13 (1.10); Appx8590-8592 at 88:14-90:17 (1.11).

whether a port is occupied" is receiving (or not receiving) messages through the port. Appx9486-9487 at 124:15-125:17; Appx41 at 4:57-61.

Mr. Dezmelyk testified that that elements 1.4-1.8 (and similar elements of independent claims 6 and 14) are not satisfied "because there's no process of detecting whether the port is occupied" in the accused devices. Appx9230-9234 at 104:19-108:17. Nonetheless, Mr. Dezmelyk agreed that each accused device determines its master/slave status (and takes actions resulting from the same) based on whether it receives messages through its IN port. Appx9228-9229 at 102:13-103:19 ("the Prima T products … use messages communicated between the KVM switches along the daisy chain to determine who is the master and who is the slave."). Uniclass did not contest that any other claim limitations of the asserted claims were met. *See* Appx9230 at 104:6-19.

Given the parties' agreement on the accused devices' technical operation, Mr. Dezmelyk's noninfringement opinion rested on his conclusion that "[o]ccupied just means that there's an actual plug in the port that has been detected." Appx9223 at 97:17-18. He intimated that "occupied" exclusively refers to "whether the cable is there or not" and that such occupation cannot be detected by "getting messages over the cable." Appx9221-9226 at 95:11-100:9. He testified that ATEN disavowed such claim scope, and compared the accused devices to prior art referenced in the prosecution history. Appx9226-9229 at 100:10-103:12.

According to Mr. Dezmelyk, physical port occupation could be detected by "pull-up resistors" or a "type of circuitry which would detect whether or not you've actually got a cable in the port," but such mechanisms are absent from the accused devices. Appx9232 at 106:4-14. He maintained that such occupation detection mechanisms are allegedly disclosed in the patent, but failed to identify a single instance where the patent taught detecting port occupation <u>without</u> assessing the receipt of messages through the port. Appx9326 at 200:5-7; Appx9328 at 202:7-10. Apart from Mr. Dezmelyk's testimony, the there is no evidence that such alleged disclosure exists. *See* Appx9487 at 125:12-25.

#### ***2. Alleged Disavowals of Claim Scope***

Mr. Dezmelyk did compare prior art to the asserted claims in an element-by-element fashion, but rather used the prosecution history to assert invalidity in broad strokes, testifying, "[t]he prior art that was before the patent office under Dr. Lavian's view of the claim term is all present." Appx9268 at 142:1-13; *see also* Appx9266-9267 at 140:17-141:12 (overruling ATEN's objection). As to three prior art references identified by the Examiner, Mr. Dezmelyk told the jury that the patentee's prosecution history arguments counseled for his "correct construction the claim." Appx9268-Appx9277 at 142:10-151:12; Appx9317 at 191:16-20; Appx9354-9355 at 228:7-229:12.

After the court refused to take any action on Mr. Dezmelyk's testimony regarding invalidity and the prosecution history of the '289 patent, Dr. Lavian testified in rebuttal. He added context to prosecution history snippets identified by Mr. Dezmelyk, and explained that the requisite element-by-element invalidity showing was not even attempted. Appx9480-9484 at 118:18-122:12; Appx9488 at 126:1-13; Appx9489-9490 at 127:12-128:9.

**E. ATEN's Partially Denied JMOL Motion**

ATEN timely moved for JMOL, seeking *inter alia,* judgments in its favor, or alternatively a new trial, on the validity of the '141 patent, and infringement of the '141 and '289 patents. The district court ruled against ATEN on these issues. Appx1-13.

As to anticipation of the '141 patent, the district court sustained the jury's invalidity verdict because "the CS-1762 device is *ATEN's*" and ATEN failed "to rebut Dezmelyk's testimony at trial with evidence of a particular date for the firmware update." Appx4. The court declined to rule on the sufficiency of evidence under the GB '540 theory, finding the issue mooted. Appx5.

In denying JMOL of infringement or a new trial, the district court heavily relied the fact that ATEN bore the burden and that "the jury was free to reject Plaintiff's proffered evidence and testimony of infringement," declining to recognize that, with the exception of handful of claim elements of the asserted

patents, infringement was uncontested. Appx8-9. The district court found that ATEN's complaints of likely jury confusion due to Mr. Dezmelyk's testimony on multiple claim constructions "first and foremost supports an argument that Plaintiff failed to meet that burden." Appx8. It held that ATEN had waived any right to contest Mr. Dezmelyk's "claim construction" testimony because ATEN allegedly failed "to raise concerns regarding the proper construction of claim terms at trial itself" in its "post-testifying Daubert" or elsewhere. Appx9-10.

In JMOL briefing, ATEN, noting Mr. Dezmelyk's concession that noninfringement and invalidity of the '141 patent were mutually exclusive, had argued that the twin verdicts were "nonsensical and cannot possible be supported by 'substantial evidence.'" Appx8094. Uniclass responded by, *inter alia,* conceding that "the Jury's finding of invalidity of the '141 Patent demonstrates that it disregarded Mr. Dezmelyk's testimony of claim scope," and arguing that the jury's invalidity finding could have been the ground of noninfringement. Appx8131-33. The district court purported to harmonize the twin verdicts by, finding, *sua sponte,* that a reasonable jury could have found <u>uncontested</u> element 1.3—*i.e.,* "starting emulating the input device to the first host"—was not practiced by the accused devices. Appx12.

## III. SUMMARY OF ARGUMENT

ATEN appeals the denial of JMOL on the jury's '141 patent invalidity verdict. It also appeals the denial of JMOL of infringement of the '141 and '289 patents and, alternatively, contends that the district court abused its discretion in denying a new trial on the same. Finally, ATEN asks this Court to reverse the district court's grant of summary judgment on lost profits.

Mr. Dezmelyk's theory that ATEN's CS-1762 device anticipated the '141 patent expressly relied on his testing of a CS-1762 that post-dated the patent. Yet, there is no evidence that the specimen's software pre-dated the patent's undisputed critical date. Uniclass bore the burden to prove that the tested device was, in fact, prior art: The district court erred in shifting the burden of proof to ATEN to prove that it was not. As to GB '540, Mr. Dezmelyk offered only conclusory testimony regarding element 1.3. Beyond this, Dr. Lavian explained how and why element 1.3 was missing from the reference; such testimony was uncontested. Substantial evidence does not support '141 patent invalidity.

Regarding both the '141 and '289 patents, Mr. Dezmelyk testified that dispositive "ordinary meaning" terms had (i) a "wrong" ATEN "claim construction" and (ii) a "correct claim construction that ... results in infringement." During trial, ATEN objected via a "post-testifying Daubert"—a practice which the district court previously indicated it approval of, arguing that "[i]t's going to

confuse the jury." The district court prejudicially erred by failing to at least give a corrective jury instruction. Further, the confused jury reached irreconcilable, inconsistent special verdicts on the '141 patent, in view of Mr. Dezmelyk's concession that invalidity and noninfringement were mutually exclusive. Thus, the district court abused its discretion by failing to order a new trial.

Aside from claim elements turning on the "ordinary meaning" of "connecting," Uniclass effectively conceded infringement of the '141 patent. Mr. Dezmelyk's narrow interpretation of "connecting" excludes indirect connections, and was grounded in his allegation the ATEN disavowed claim scope during prosecution. This interpretation is not reasonable, and there was no "clear and unequivocal" disavowal. ATEN's broader interpretation—which Uniclass conceded that the jury adopted—was based on what "the claim language simply requires" and maintained that an indirect connection is still a connection. Mr. Dezmelyk effectively admitted that the disputed claim elements were satisfied under ATEN's interpretation. Thus, the only reasonable conclusion is that the accused devices infringed the '141 patent: JMOL of infringement should be granted.

Similarly, excepting claim elements that turned on the "ordinary meaning" of "detecting whether the first port is occupied," Uniclass effectively conceded infringement of '289 patent. Mr. Dezmelyk's narrow interpretation that port

occupation detection cannot occur by way of detecting messages received through the port was exclusively grounded in his testimony that ATEN disavowed claim scope in the patent's disclosure and prosecution history. This interpretation is unreasonable, and there is no "clear and unequivocal" disavowal. ATEN's broader interpretation follows what "the claim language simply requires," and is confirmed by the fact that message detection is the only occupation detection mechanism disclosed in the patent. At least in some instances, the disputed claim elements are satisfied under ATEN's interpretation. Thus, the only reasonable conclusion is that the accused devices infringed the '289 patent: JMOL of infringement should be granted.

Lastly, the district court's summary judgment on ATEN's lost profits claim damages against Uniclass Tech. should be reversed. The decision rested on the erroneous conclusion that ATEN's damages expert Mr. Snell did not use sound economic principles because he (i) relied on statements made by ATEN fact witness Mr. Chen when forming his opinion, and (ii) allegedly failed to properly account for competitors other than ATEN and Uniclass in the U.S. KVM OEM market. In light of these errors and because genuine issues of material fact existed, reversal is warranted.

## IV. ARGUMENT

### A. Legal Standards

This Court reviews "denials of motions for JMOL and motions for new trial under the law of the regional circuit—here, the Ninth Circuit. The Ninth Circuit reviews denials of JMOL *de novo*." *TVIIM, LLC v. McAfee, Inc.,* 851 F.3d 1356, 1362 (Fed. Cir. 2017) (internal citations omitted).

"In the Ninth Circuit, the district court grants JMOL when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. A district court must uphold a jury's verdict if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* (citations and quotation marks omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).

"The Ninth Circuit reviews the denial of a motion for new trial for abuse of discretion. It reverses the denial only if the record lacks any evidence supporting the verdict or if the district court makes a mistake of law." *TVIIM, Inc.,* 851 F.3d at 1362 (internal citations omitted). "A trial court should grant a motion for a new trial if (1) the jury instructions were erroneous or inadequate, (2) the court made incorrect and prejudicial admissibility rulings, or (3) the verdict is contrary to the

great weight of the evidence." *Chiron Corp. v. Genentech*, Inc., 363 F.3d 1247, 1258 (Fed. Cir. 2004). If a district court is unable to reconcile inconsistent special jury verdicts "under a fair reading of them," a new trial is warranted. *Flores v. City of Westminster*, 873 F.3d 739, 755-56 (9th Cir. 2017) (internal quotation marks omitted.) Where a trial court allegedly harmonizes inconsistent special verdicts, the Ninth Circuit reviews such reconciliation *de novo*. *Id.*

Whether a claim is anticipated is a question of fact, as is the question of infringement. *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1330, 1335 (Fed. Cir. 2009). "Whether a reference was published [sold, or otherwise publicly available] prior to the critical date, and is therefore prior art, is a question of law based on underlying fact questions." *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151 (Fed. Cir. 2004).

"This court reviews without deference a district court's grant of summary judgment, reapplying the same standard as the district court." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1121 (Fed. Cir. 2003) (citing Fed. R. Civ. P. 56(c)). "Availability of lost profits is a question of law reviewed without deference." *Id.* at 1122.

### B. The ’141 Patent Invalidity Verdict Is Not Supported by Substantial Evidence

The jury found the ’141 patent invalid as anticipated under at least one the two theories Uniclass presented at trial, namely (i) that ATEN’s CS-1762 anticipates and (ii) that GB ’540 anticipates. Because the record lacks substantial evidence under either theory, this Court should reverse the denial of JMOL and direct a judgment of no invalidity of the ’141 patent. *See Cordance Corp. v. Amazon.Com Inc*., 658 F.3d 1330, 1339 (Fed. Cir. 2011).

#### i. There is No Evidence that the CS-1762 Antedates the Critical Date

In district court, the party asserting invalidity of a patent claim bears the burden of establishing invalidity. 35 U.S.C. § 282(a). That burden of proof never shifts to the patent owner.” *Aqua Products, Inc. v. Matal*, 872 F. 3d 1290, 1305 (Fed. Cir. 2017) (emphasis added); *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984). Thus, to invalidate a patent under pre-AIA 35 U.S.C. § 102(b), an accused infringer must prove that by the critical date—i.e., one year prior to filing—the claimed invention must have “been ready for patenting” and either publicly disclosed or offered for sale. *E.g., Pfaff v. Wells Elecs., Inc*., 525 U.S. 55, 57, 67 (1998). The patent challenger must prove, by clear and convincing evidence, that that asserted reference predates the critical date, and, accordingly, is, actually, prior art. *Typeright*, 374 F.3d at 1157-59.

As to the CS-1762, the undisputed critical date for the '141 patent is July 24, 2006—one year prior to its filing date. Appx4; Appx24; Appx9302-9303 at 176:22-177:3. Mr. Dezmelyk relied on the disclosures of a CS-1762 manual, but admitted that element 1.3 and 1.4 were not "disclosed by the manual." Appx9303-9305 at 177:12-179:11; Appx9307-9311 at 181:10-185:7; Appx9337-9338 at 211:4-212:25. Thus, the manual, alone, cannot anticipate.

Mr. Dezmelyk purported to fill in the gaps left by the manual by relying on his testing of a 2009 CS-1762 specimen. But, as the 2009 device was undisputedly manufactured after the critical date, it cannot be relied upon to invalidate the '141 patent. Appx9311-9316 at 185:6-190:13; Appx9338 at 212:5-22. *Typeright*, 374 F.3d at 1157-59.

At best, Uniclass offered Mr. Dezmelyk's uncorroborated testimony that the 2009 device operated using software dating to 2006. *Id.* But even assuming that he tested a 2009 CS-1762 device that had firmware from the same year as critical date, the record contains absolutely no evidence that such firmware predated the undisputed July 24, 2006, critical date. Appx9302-9303 at 176:22-177:3; Appx9311-9316 at 185:6-190:13; Appx9338 at 212:5-22; *accord* Appx4. Thus, even if Mr. Dezmelyk's uncorroborated testimony of a firmware release year could

convert the 2009 CS-1762 device into a 2006 device (which it cannot[19]), the record lacks any evidence that the firmware pre-dated critical date. Appx9302-9303 at 176:22-177:3, Appx9338 at 212:18-25; *see also* Appx9505-9506 at 143:4-144:1.

Despite the lack of evidence on this issue—whose clear and convincing burden of proof is squarely borne by Uniclass—the district court denied ATEN's JMOL motion, finding that "substantial evidence" supported the jury's potentially inherent determination that the CS-1792 was prior art because "the CS-1762 device is ATEN's device" and ATEN had "not pointed to any conclusive evidence or testimony from trial to support the theory that the firmware was not prior art because it was released after the critical date." Appx4-5. This is *prima facie* burden shifting; it is legal error *per se*. *Aqua Products*, 872 F. 3d at 1305; *Jones*, 727 F.2d at 1528. No authority supports that such facts entitle Uniclass to a presumption that the 2009 CS-1792 is actually prior art, regardless of the extent to which Uniclass was able to confuse the jury and the district court as to what it was required to prove. *Typeright*, 374 F.3d at 1157-59; Appx4; Appx8124; *cf.* Appx9525-9526 at 163:15-164:18; Appx9595 at 233:10-24.

If Uniclass believed that the relevant firmware actually pre-dated the critical date, it should have developed such evidence during discovery. Its failure to do

[19] "Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent." *Typeright*, 374 F.3d at 1159 (internal quotations and brackets omitted); *accord. Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1376 (Fed. Cir. 2012).

so—which correspondingly denied ATEN any incentive to develop countervailing evidence—cannot authorize the lower court to shift Uniclass' burden. "That burden of proof never shifts to the patent owner." *Aqua Prods.*, 872 F. 3d at 1305.

Thus, the record plainly lacks "evidence adequate to support the jury's [presumed] conclusion" that the CS-1762 was prior art by "clear and convincing" evidence. *TVIIM,* 851 F.3d at 1362; *Typeright,* 374 F.3d at 1157-59. JMOL of no invalidity is warranted.

Beyond this, Mr. Dezmelyk's anticipation "analysis" of claims 8 is even deficient and conclusory: His entire testimony is that "the limitations … are met as well." Appx9310-9311 at 184:23-185:3. This provides an additional ground for JMOL of no invalidity. *Schumer v. Lab. Comp. Sys., Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002).

#### ii. Uniclass Offered Only Conclusory Statements Regarding Alleged Anticipation by GB '540

"General and conclusory testimony … does not suffice as substantial evidence of invalidity." *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004). "Typically, [invalidity] testimony must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Schumer,* 308 F.3d at 1315-16 (this Court rejecting Mr.

Dezmelyk's invalidity opinion as lacking "the requisite clarity"). A finding of anticipation requires the presentation of "clear and convincing evidence" that "each and every element is found within a single prior art reference, arranged as claimed." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015) (emphasis added).

Element 1.3 of the '141 patent recites "starting emulating the input device to the first host." Appx33-34 at 8:67-9:3 (emphasis added); Appx8725 at 11:5-20. Claim 9 recites a similar limitation.

Mr. Dezmelyk—in the context of other asserted patents and claim elements—testified that GB '540 discloses "emulating one or more of the console devices." Appx9284 at 158:4-17; Appx9296 at 170:10-20, Appx9301-9302 at 175:20-176:6; Appx9285-9286 at 159:16-160:18. However, for elements 1.3 and 9.3, he failed to explain—or even baldly assert—how such generic emulation meets the requirement of "emulating…to the first host." *See* Appx9300-9302 at 174:13-176:13. He never substantively addressed this sub-limitation in any respect—let alone in a clear and convincing manner.

This failure is further confirmed by the JMOL briefing below, where Uniclass all but admitted that the record lacks evidence that that GB '540 teaches "emulating…to the first host." *See* Appx8154. That is, Uniclass could only identify testimony regarding emulation that was divorced from "emulating…to the first

host."[20] By declining to offer any evidence as to how the "to the first host" sub-limitation was met, Uniclass failed—as matter of law—to prove anticipation. This Court should, once again, hold Mr. Dezmelyk's conclusory, "generalized testimony" legally insufficient. *Schumer*, 308 F.3d at 1315-16.

Beyond Uniclass' failure to present clear and convincing evidence, Dr. Lavian offered detailed countervailing testimony. Appx9500-9503 at 138:5-141:120; Appx9493-9494 at 131:17-138:4. Moreover, this testimony stands unchallenged: On cross-examination, Uniclass' counsel declined to ask Dr. Lavian a single question on the missing sub-limitation. Appx9511-9529 at 149:19-167:20.

Thus, the record plainly lacks "evidence adequate to support the jury's [presumed] conclusion" that "each and every element is found within [GB '540], arranged as claimed" by "clear and convincing" evidence. *TVIIM,* 851 F.3d at 1362; *Summit,* 802 F.3d at 1294. This Court should reverse the invalidity verdict.[21]

[20] *Compare* Appx8125 at 8:10-15 (citing Appx9145-9146 at 19:19-20:6; Appx9279-9280 at 153:9-154:7; Appx9284-9286 at 158:4-159:19, 160:3-18; Appx9296 at 170:9-20; Appx9302 at 176:20-176:13.) *with* Appx8087 at 5:11-22 (identifying most of the same citations of Mr. Dezmelyk's testimony as inapt emulation disclosures), 6:2-8 (referencing Dr. Lavian's immaterial concession that GB' 540 discloses "a different type of emulation").

[21] Having erroneously sustained Uniclass' CS-1762 anticipation theory, the district court declined to evaluate the sufficiency of evidence regarding the GB '540 theory. Appx5. Although this Court does not typically evaluate sufficiency of evidence in the first instance, ATEN respectfully submits that it should to do so here where: (i) both the jury and the district court addressed the broader question of '141 patent invalidity; (ii) *de novo* review applies; (iii) Uniclass, below, was

### C. The Jury's Noninfringement Verdicts Are Unsupported by Substanial Evidence and Irredeemably Tainted by Uniclass' Expert's Claim Construction Testimony

#### i. The District Court Unfairly Prejudiced ATEN and Abused Its Discretion by Erroneously Permitting Mr. Dezmelyk's Claim Construction Testimony to Stand Without Corrective Jury Instruction

This Court has repeatedly held that "allowing the experts to make arguments to the jury about claim scope [is] erroneous" and "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Nobelbiz Inc. v. Global Connect, LLC*, 701 Fed. Appx. 995, 997 (Fed. Cir. 2016); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008); *Cordis*, 561 F.3d at 1337-38 (affirming preclusion of prosecution history-based claim construction arguments).

For example, in *Cytologix Corp. v. Ventana Medical Systems, Inc.*, "the parties … presented expert witnesses who testified before the jury regarding claim

---

unable to offer <u>any</u> non-conclusory evidence that GB '540 disclosed the specific claim elements disputed herein, *see* Appx8125-26—effectively waiving any factual issues; and (iv) addressing this issue would save judicial resources. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1565-66 (Fed. Cir. 1987); *In Re Hodges*, 882 F.3d 1107 (Fed. Cir. 2018) (reversing anticipation without remand despite the PTAB decision's lack of requisite factual findings or explanation.).

construction, and counsel argued conflicting claim constructions to the jury." 424 F.3d 1168, 1172 (Fed. Cir. 2005). This Court held:

> This was improper, and the district court should have refused to allow such testimony despite the agreement of the parties. The risk of confusing the jury is high when experts opine on claim construction before the jury even when, as here, the district court makes it clear to the jury that the district court's claim constructions control.

*Id.* It appeared "that the conflicting expert views as to claim construction created confusion and may have led to a verdict of infringement regarding the asserted claims of the [asserted] patent that was not supported by substantial evidence." *Id.; accord Warsaw Orthopedic, Inc. v. NuVasive, Inc.,* 824 F.3d 1344, 1350 (Fed. Cir. 2016). Ultimately, however, the *Cytologix* Court declined to reverse because "there was no objection to the expert testimony as to claim construction." 424 F.3d at 1173.

Thus, on condition that the claim construction testimony issue is raised before or "during trial," a "district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to 'intelligently determine the questions presented.'" *LifeNet Health v. LifeCell Corp.,* 837 F.3d 1316, 1322 (Fed. Cir. 2016); *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (citation omitted). A trial court is "obligated to provide the jury with a clear understanding of the disputed claim scope—[and a] continuing debate as to the meaning of [claim terms] during trial"

evinces error. *Eon Corp. v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).

No authority cited below supports that an expert may properly testify regarding dueling claim constructions—*i.e.,* that the patentee is asserting one claim construction, and the accused infringer another. Appx9-10. Rather, each case cited by the district court merely stands for the unremarkable proposition that an invalidity expert may assume the *same* interpretation that the opposing expert used in asserting infringement. *Cordance,* 658 F.3d at 1335-37 (distinguishing invalidity expert's use of patentee's "infringement theory" for an element-by-element analysis from an improper "practicing the prior art defense"); *Nobelbiz, Inc. v. Glob. Connect, L.L.C.*, No. 6:12-CV-244-RWS, 2015 U.S. Dist. LEXIS 179377, at *12 (E.D. Tex. July 16, 2015) (hold that invalidity expert may use the patentee's "claim interpretations," but precluding his testimony as "merely compar[ing] the prior art and the accused products"); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.,* 87 F.Supp.3d 928, 943 (N.D. Cal. 2015) (finding it proper for an expert to testify on invalidity while "assum[ing] that [the opposing party's] understanding of the construed claims is correct"); *HSM Portfolio LLC v. Elpida Memory Inc.,* 160 F. Supp. 3d 708, 725–26 (D. Del. 2016) (finding it permissible to offer anticipation testimony in the same manner as patentee's infringement theory, and taking *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348,

1363–64 (Fed. Cir. 2008) "as an affirmation that anticipation requires a strict limitation-by-limitation analysis").

Mr. Dezmelyk undisputedly "offered an opinion on what the scope of the claim terms are." Appx9328 at 202:17-19; *Nobelbiz*, 701 Fed. Appx. at 997. He offered testimony regarding the patent's specification, the prosecution history, and even the prior art to arrive at a "claim construction" that might support noninfringement. *See* Sections II.D.i.1, II.D.ii.1, II.D.ii.2, *above*.

He told the jury that, as to each of the '141 and '289 patents, there were dueling claim constructions: He testified in favor of "the [allegedly] correct <u>claim construction</u> that I've presented that results in noninfringement," which he also called "the correct construction," the "proper construction," and "the proper claim boundary." *E.g.,* Appx9317 at 191:2-6 (emphasis added), 191:16-25. And, he testified that "the prior art overlaps" "under the interpretation Dr. Lavian has of what those claim terms mean," which is "indicative of [Dr. Lavian's] <u>claim construction</u> being wrong." Appx9354-9355 at 228:21-229:3; *e.g.,* Appx9334 at 208:16-18. Under clear Federal Circuit precedent, the jury should not have heard and credited such testimony. *E.g., Cytologix Corp.,* 424 F.3d at 1172.

During trial, ATEN raised an objection to Mr. Dezmelyk's dueling claim construction testimony being put before the jury without qualification:

> [Mr. Dezmelyk] said there was an ATEN claim construction in this case. That's in the record, and that's going to confuse the jury.

> We have two claim constructions. I think it's very clear that what the jury should be considering is only the terms that you've construed and in the plain and ordinary meaning of the rest of the terms. If they wanted to present that evidence that it was a plain and ordinary meaning, and that was his interpretation of the plain and ordinary meaning, they could have done so.
>
> But they chose to present it as ATEN's claim construction, and that's improper. It's going to confuse the jury, Your Honor.

Appx9359-9360 at 233:25-234:18 (emphasis added). The district court erred by allowing Mr. Dezmelyk's improper claim construction territory to stand in its entirety—without offering any limiting jury instruction. Appx1-2.

Beyond ATEN's oral motion, relevant '141 claim scope issues were raised during claim construction—when Uniclass sought to have all "connecting" and "disconnecting" terms include a "direct" limitation. Appx1871; Appx1364, Appx1366; Appx1387; Appx9618; Appx1389-1390. The lower court rejected Uniclass' claim construction in favor of a "plain and ordinary meaning" construction that did not recite the "direct" or "active" requirement. Appx1871, Appx1879-1880, Nonetheless, Mr. Dezmelyk ultimately testified to the jury that the "correct construction that results in noninfringement" requires an "active connection." Appx9317 at 191:2-6; Appx9252 at 126:8-21.

Unsurprisingly, the unmitigated dueling claim construction testimony resulted in a confused jury. *E.g., Warsaw Orthopedic,* 824 F.3d at 1350. While Mr. Dezmelyk argued for infringement under his "correct claim construction," he

averred that if his construction were adopted by the jury, the '141 patent would not be invalid: He testified that "under the correct claim construction that I've presented that results in noninfringement … the '141 patent are not invalid over the prior art." Appx9316-9317 at 190:14-191:25**.** The jury found the '141 patent invalid by clear and convincing evidence, yet still found it not infringed, demonstrating its foreseen confusion. Appx2. Nonetheless, the district court dismissed ATEN's "jury confusion" argument with little regard to its apparent and expressly prophesied cause, holding that such confusion "fist and foremost supports … that [ATEN] failed to meet [its infringement] burden. Appx8.

#### *1. If JMOL of Infringement is Not Granted, the Trial Court's Failure to Limit Mr. Dezmelyk's Dueling Claim Construction Testimony Warrants a New Trial*

"When the parties raise an actual dispute regarding the proper scope of [] claims, the court, not the jury, must resolve that dispute." O2 Micro, 521 F.3d 1351,1360. This is not what happened below: Despite that an actual dispute was explicitly raised by Mr. Dezmelyk's testimony—and identified by ATEN's objection—the jury determined claim scope for both the '141 and '289 patents. Thus, the jury's noninfringement verdicts embody legal error and the district court abused its discretion by "allow[ing] Mr. Dezmelyk's testimony to stand in its entirety" after ATEN's objection during trial. Appx8130; *Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1364 n. 6 (Fed. Cir. 2008).

To the extent that this Court does not grant JMOL of infringement in view of the arguments below, a new trial is warranted due to the trial court's erroneous and prejudicial failure to offer *any* corrective jury instruction on Mr. Dezmelyk's improper testimony —which is an "incorrect and prejudicial admissibility ruling" that rendered "the jury instructions … inadequate." *Chiron*, 363 F.3d at 1257; *Metso Minerals, Inc. v. Powerscreen Int'l Dist, Ltd.*, 526 Fed. Appx. 988, 995 (Fed. Cir. 2013) (explaining that a jury instruction error "is only harmless" if it "could not have changed the result," and ordering a new trial.); *see Cytologix*, 424 F.3d at 1174.

#### ***2. If JMOL of Infringement is Not Granted, the Jury's Irreconcilably Inconsistent Special Verdicts on the '141 Patent Also Warrant a New Trial***

In view of Mr. Dezmelyk's explicit concession that the '141 patent invalidity and noninfringement were mutually exclusive, the jury's twin special verdicts of noninfringement and invalidity are nonsensical, irreconcilable, unreasonable, and cannot possibly be supported by "substantial evidence." Appx9316-9317 at 190:14-191:25**;** Appx2.

Attempting to reconcile the jury's incompatible noninfringement and invalidity verdicts, the district court held that

> the jury still could still have reasonably credited Dezmelyk's testimony that the Accused Products continuously emulate and thus the "starting emulating the input device to the first host" (after

disconnecting the input device) limitation is not met.

Appx12. Here, the lower court referred to element 1.3, which Mr. Dezmelyk and Uniclass conceded. Sections II.D.i.1 above, *and* IV.C.ii.1 below. Indeed, Mr. Dezmelyk—having declined to contest the accused devices' satisfaction of element 1.3 in his expert report—was precluded from contesting it at trial, and did not attempt to do so. Appx6958-6999; *e.g.,* Fed. R. Civ. P. 26(2)(B)(i). Moreover, Uniclass, in apparent recognition of its concession, failed to contest element 1.3 during JMOL briefing, waiving the issue. *See generally* Appx8128-8133.

Reviewing *de novo,* this Court should reject the district court's *sua sponte* finding that a reasonable jury could have found this undisputed element unsatisfied. *Flores,* 873 F.3d at 756; *Comaper Corp. v. Antec, Inc*., 596 F.3d 1343, 1350-51 (Fed. Cir. 2010) (finding error in trial court's verdict reconciliation conclusion on *sua sponte* grounds). And, on appeal, Uniclass should not be permitted to press this *post hoc* reasoning that it did not present—and could not have presented—to the jury. *Id.; e.g., Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251-52 (Fed. Cir. 2005).

Thus, if this Court does not grant JMOL of infringement, a new trial on infringement of the '141 patent should be granted for the additional reason that the jury's verdicts are "irreconcilably inconsistent." *See, e.g., Comaper*, 596 F.3d at 1345, 1355 (Fed. Cir. 2010).

### *3. ATEN Did Not Waive Arguments Regarding Mr. Dezmelyk's Dueling Claim Construction Testimony*

While an "appellate court retains case-by-case discretion over whether to apply waiver," there can be no wavier where the appealed issue is "the same concept" that was raised below. *Harris Corp.*, 417 F.3d at 1251-52. Waiver does not accrue if the lower tribunal was "fairly put on notice as to the substance of the issue"; the law "does not demand the incantation of particular words." *Nelson v. Adams USA, Inc.,* 529 U.S. 460, 469 (2000); *Norsk Hydro Canada, Inc. v. U.S.,* 472 F.3d 1347, 1359 (Fed. Cir. 2006). As to the "requisite specificity" of arguments needed to stave off wavier, "terse — even cryptic" arguments raised "in abbreviated form" are enough. *Gaus v. Conair Corp.,* 363 F.3d 1284, 1287 (Fed. Cir. 2004). Nonetheless, challenges to claim construction are waived when "raised for the first time after trial" or "on appeal." *TVIIM*, 851 F.3d at 1363

Below, the district court found "one ground for waiver of some of Plaintiff's JMOL infringement arguments"—namely, that ATEN "effectively waived any challenge based on an improper claim construction." Appx4; Appx10 citing *TVIIM*, 851 F.3d at 1363). While the district court appeared to understand "that Plaintiff was not attempting to raise an argument that the Court had failed to construe claim terms," it misapprehended ATEN's dispute regarding Mr. Dezmelyk's improper dueling claim construction testimony. Appx10.

Despite ATEN's argument that, under Mr. Dezmelyk's testimony, "[w]e have two claim constructions" "and that's going to confuse the jury," the lower court erroneously found that "Plaintiff's sole objection was that Dezmelyk had testified using *Plaintiff's expert's* plain and ordinary interpretation of the claims for purposes of some of his arguments." Appx9359-9360 at 233:25-234:18; Appx8282 (emphasis in original). This was <u>not</u> ATEN's objection—let alone its sole objection: Had Mr. Dezmelyk adopted "*Plaintiff's expert's* plain and ordinary interpretation" and testified accordingly for both infringement and invalidity, ATEN's objection would have been obviated. Appx9357-9358 at 231:23-232:6; *e.g.,* Appx9328 at 202:11-19; *Laitram Corp. v. Cambridge Wire Cloth Co*., 863 F.2d 855, 866 (Fed. Cir. 1988) (finding legal error in interpreting a claim differently for infringement and validity); *Cordance,* 658 F.3d at 1335-37. Indeed, ATEN explained that, by telling the jury that there are "two claim constructions" rather than "only one claim construction, Your Honor's claim construction," Mr. Dezmelyk offered testimony "contrary to the district court's claim construction." Appx9358-9360 at 232:2-6, 233:25-234:18; *cf. LifeNet Health,* 837 F.3d at 1322-23 (recognizing that a litigant's "failure to sufficiently request further construction leading up to and <u>during trial</u>" was not mutually exclusive with that litigant's seeking "to exclude testimony contrary to the district court's claim construction.").

Additionally, the district court's erroneous finding of waiver excessively relied on "the incantation of particular words" that ATEN's counsel used to introduce its objection, and the timing of such objection during trial. *Nelson,* 529 U.S. at 469; Appx9. While the initial articulation of ATEN's objection as a "post-testifying Daubert on Mr. Dezmelyk's *testimony on invalidity with respect to anything that required an ATEN claim construction*" may have been imperfect, ATEN's counsel's ensuing argument laid plain what the objection was really about—namely, Mr. Dezmelyk's improper presentation of dueling claim constructions to the jury. Appx9 (emphasis in original, citing Appx9357-9358 at 231:23–232:6); Appx9357-9360 at 231:23-234:20); *Gaus,* 363 F.3d at 1287. Moreover, as Mr. Dezmelyk did not even attempt to offer an element-by-element invalidity opinion with respect the '289 patent, it cannot seriously be disputed that his self-styled invalidity testimony was anything more than a vehicle to offer his improper dueling claim construction testimony. *See* Section II.D.ii.2 *above*.

As to timing, ATEN, in hindsight, may have been better served by objecting earlier. Nonetheless, the timing of ATEN's objection "during trial" left the district court ample opportunity to strike or qualify improper portions of Mr. Dezmelyk's testimony with a corrective jury instruction. Appx8130 ("ATEN made this argument during trial....")*; LifeNet,* 837 F.3d at 1322. Furthermore, ATEN's timing was informed by the district court's stated position that, regarding "a post-

testimony Daubert hearing," "[t]here's nothing wrong with that as far as I'm concerned." Appx9131-9132 at 5:23-6:2. Given this expressed tolerance for post-testimony attacks on expert testimony, ATEN reasonably delayed its objection to further refine the record on Mr. Dezmelyk's dueling claim construction testimony through cross-examination. *E.g.,* Appx9328 at 202:11-19.

Ultimately, ATEN's objection adequately raised "the same concept" argued above—namely that Mr. Dezmelyk's dueling claim construction testimony should not have been received by the jury—at least without a qualifying jury instruction. *Harris*, 417 F.3d at 1251-52. Because the trial court was "fairly put on notice as to the substance of the issue," there is no waiver here. *Nelson,* 529 U.S. at 469.

**ii. ATEN Is Entitled to JMOL of Infringement of the '141 Patent**

***1. Undisputed Claim Elements of the '141 Patent Should be Deemed Satisfied***

JMOL "is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hagen v. City of Eugene*, 736 F.3d 1251, 1256 (9th Cir. 2013) (internal citations omitted; emphasis added). JMOL is assessed from the standpoint of "reasonable jury", and a "court should give credence to the evidence favoring the nonmovant" as well as "evidence supporting the moving party that is uncontradicted and unimpeached." Fed.R.Civ. P. 50(a)(1) (emphasis

added); *Reeves v Sanderson Plumbing Products*, 530 U.S. 133, 151 (2000).

Additionally, admissions by the non-movant are to be considered "statements that the jury would not be at liberty to disbelieve." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1065 (Fed. Cir. 1998) (internal quotations omitted); *accord Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1330, 1332-33 (Fed. Cir. 2013) (affirming JMOL of infringement under the Ninth Circuit's *de novo* standard). Moreover, the failure of a JMOL opponent to contest particular factual issues may result in those issues being found in favor of the movant—even where the movant bears the burden of persuasion. *Id.* at 1333.

Below, the district court held that "the jury was free to reject [ATEN's] proffered evidence and testimony of infringement" because it was ATEN's "burden to prove infringement at trial"—entirely failing to address ATEN's argument that Uniclass effectively conceded the accused devices' satisfaction of undisputed claim limitations. Appx8. Taken to its logical conclusion, the district court's holding would virtually always preclude JMOL of infringement, as the patentee bears the burden of persuasion and such burden could never be met if a "reasonable jury" was always free to unequivocally reject all of the patentee's evidence.

The Federal Circuit has already put this erroneous notion to rest, repeatedly finding appropriate JMOL of infringement, and even JMOL of invalidity with its

attendant "clear and convincing" evidentiary burden. *E.g., Parkervision, Inc. v. Qualcomm Inc.,* 621 Fed. Appx. 1009, 1022 (Fed. Cir. 2015) ("We conclude that [Patentee] has failed to point to any basis on which a reasonable jury could have rejected [the evidence that the reference anticipates]"); *Broadcom,* 732 F.3d at 1330, 1332-33; *Proveris Scientific Corp. v. Innovasystems, Inc*., 536 F.3d 1256, 1266-67 (Fed. Cir. 2008). More specifically, this Court has rejected attacks on "sufficiency of evidence to support … JMOL of infringement" where the accused infringer failed to "specifically argue at trial that it did not practice [a particular] limitation" and "elected not to cross examine [the patentee's] expert on this issue." *Broadcom,* 732 F.3d at 1333.

With the exception of elements 1.1 and 1.2, ATEN's infringement case was both adequate and undisputed. *See* Section II.D.i.1 above. That is, Uniclass declined to offer any specific argument on any of limitations 1.0, 1.3, and 1.4, and the additional limitations of dependent claims 2, 3, and 8; declined to cross examine Dr. Lavian regarding such limitations; and offered no countervailing testimony from Mr. Dezmelyk on the same. *Id.* Satisfaction of these elements is effectively conceded, and no reasonable jury could have found them unsatisfied. JMOL of infringement cannot be defeated through these uncontested elements of the '141 patent. *Broadcom,* 732 F.3d at 1333.

### *2. Interpretations of "Ordinary Meaning" Claim Elements on JMOL Must Be Reasonable*

"To grant [JMOL], this Court must find that the evidence presented at trial permits only one reasonable conclusion and that no reasonable juror could find in the non-moving party's favor." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1378 (Fed. Cir. 2014) (internal quotations omitted).

Where "no request for claim construction" was timely made, the question of infringement on JMOL "is limited to whether substantial evidence supports the jury's verdict under the issued construction." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1306, 1308 (Fed. Cir. 2018); *LifeNet*, 837 F.3d. at 1322-23. In such circumstances, "ordinary meaning" controls, and this Court is guided by what "the claim language simply requires." 879 F.3d at 1306-09. Reviewing JMOL denials *de novo,* disputes over the interpretation of "ordinary meaning" claim language should ultimately be resolved by determining whether it would have been "reasonable for the jury to interpret" the disputed claim language in the manner advocated by the non-movant. *Id.*

Even where claim scope is selected from competing interpretations of an ordinary meaning claim term rather than a formal claim construction, "intrinsic evidence" may be considered. *Broadcom*, 732 F.3d at 1332-1333. However, when "language in the specification or the prosecution history" is used to argue for disavowal of claim scope, "the standard … is exacting, requiring clear and

unequivocal evidence." *Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016).

#### *3. Uniclass' Allegedly "Correct Claim Construction" of "Connected" Is Not a Reasonable "Ordinary Meaning" Interpretation*

Uniclass' only '141 patent noninfringement theory stems from a hyper-narrow—and unreasonable—interpretation of disputed elements 1.1 and 1.2. Mr. Dezmelyk's noninfringement testimony was that "an input device is connected to a host [only] when it responds to requests from that host." Appx9240 at 114:4-6 (emphasis added); *see also* Appx9241 at 115:15-17. He argued that the claim language of elements 1.1 and 1.2 implicitly required "that active connection" (and disconnection) between a host and an input device. Appx9252 at 126:1-126:17; Appx9256 at 130:4-11 ("that connecting and disconnecting."). At base, Mr. Dezmelyk testified that the ordinary meaning of "connecting" excludes indirect connections. Appx9237-9240 at 111:1-114:24. This, notwithstanding that the district court had already rejected Uniclass' claim construction arguments that the "connection" must be "direct." *See* Section II.B above.

Whether this Court considers Mr. Dezmelyk's claim scope testimony to be (i) claim construction testimony improperly presented to the jury or (ii) opinion testimony permissibly offering an interpretation of "ordinary meaning," Mr. Dezmelyk undisputedly testified to the jury that ATEN, in the specification and the

prosecution history of the '141 patent, disavowed indirect connections (and disconnections) from claim scope. *See generally* Appx9239-9247 at 113:12-121:16. For example, he testified that his interpretation of elements 1.1 and 1.2, was "what ATEN … thought their invention was at the time they actually filed it." Appx9242 at 116:11-23. And.

In view of a jury's presumed lack of ability to understand the import of prosecution history statements[22] and Dr. Lavian's countervailing testimony on the same, no reasonable jury could have found that "clear and unequivocal evidence" supported that ATEN disavowed any indirect connections from claim scope. *Poly-America*, 839 F.3d at 1136. Further, "the claim language simply requires" connecting (and disconnecting)—and does not provide that such connections be "direct" or "active." *Finjan,* 879 F.3d at 1307-09. Mr. Dezmelyk's restrictive interpretation of the plain meaning of words is not reasonable—and a reasonable jury could not have adopted it.

Beyond the trial record, Uniclass, in attempting to harmonize the plainly inconsistent noninfringement and invalidity verdicts, expressly conceded that "the jury's finding of invalidity of the '141 Patent demonstrates that it disregarded Mr. Dezmelyk's testimony of claim scope." Appx8131 at 14:11-15; Appx9317 at

[22] *E.g., MediaTek Inc., v. FreeScale Semiconductor, Inc.*, Case No. 11-cv-5341, 2014 U.S. Dist. LEXIS 31461, at *16-17 (N.D. Cal. Mar. 5, 2014) ("[T]estimony grounded in the prosecution history to discern the meaning of a claim is properly excluded from presentation to the jury.").

191:16-25. Uniclass' surprising admission further counsels toward rejecting Mr. Dezmelyk's unreasonably narrow interpretation.

#### *4. Under Any Reasonable Interpretation of "Connected" Elements 1.1 and 1.2 are Satisfied*

Once Mr. Dezmelyk's unreasonable interpretation is rejected, infringement is all but a foregone conclusion—and it is plain that substantial evidence cannot support the noninfringement verdict.

"[T]he claim language simply requires" connecting and disconnecting, not "that active connection" or "breaking … then establishing direct communication pathway between the host and the emulator." *Finjan,* 879 F.3d at 1307-09; Appx9252 at 126:9-13; Appx1387; *see also* Appx1389-1390. Thus, the ordinary meaning of "connecting" encompasses indirectly connecting—even through a chip with an emulator function.

As such, Mr. Dezmelyk's admission that "if I type my name into the keyboard in one of these accused KVM devices, it would go to the host" is dispositive. Appx9332 at 206:23-25. It is a statement that "the jury would not be at liberty to disbelieve" and manifests connection. *Nobelpharma,* 141 F.3d at 1065; *Broadcom*, 732 F.3d at 1330-31, 1333. Even assuming, *arguendo*, that the keyboard data "goes first to a local host, and then the messages are sent to the emulator chip and the information is passed on from there" and the keyboard is "not responding to polling from the host," the passage of keyboard data through

the KVM switch and to the computer conclusively establishes the existence of at least an indirect connection. *Id*. Appx9332-9333 at 206:18-207:4.

Uniclass made no noninfringement argument under any "connecting" interpretation that encompasses indirect connections. *Cordis Corp. v. Boston Sci. Corp*., 658 F.3d 1347, 1357-58 (Fed. Cir. 2011) (disregarding expert testimony based on an incorrect claim scope). Dr. Lavian's opinion testimony on the accused devices' satisfaction of elements 1.1 and 1.2 under such interpretation is therefore "uncontested and unimpeached" and, may be substantively considered on JMOL. *Reeves*, 530 U.S. at 151; *Broadcom,* 732 F.3d at 1333.

Thus, so long as Mr. Dezmelyk's unreasonably narrow, prosecution history-based interpretation of an "ordinary meaning" term is not sanctioned by this Court, "the evidence, construed in the light most favorable to [Uniclass], permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hagen*, 736 F.3d at 1256. JMOL of infringement of the '141 patent is appropriate.

**iii. ATEN Is Entitled to JMOL of Infringement of the '289 Patent**

***1. Undisputed Claim Elements of the '289 Patent Should be Deemed Satisfied***

The district court found the jury "free" to reject any and all evidence of infringement of the '289 patent in view of ATEN's burden. Appx8. Such reasoning is erroneous. *See* Section IV.C.ii.1 above. Excepting elements 1.5-1.8 of claim 1

(and parallel elements of independent claims 6 and 14), ATEN's infringement case was both adequate and undisputed. Section II.D.ii.1 above, *above*. Uniclass declined to offer any specific argument on any other limitation; declined to cross examine Dr. Lavian regarding any other limitation, and declined to offer any countervailing expert testimony on the same. *Id.; Broadcom,* 732 F.3d at 1333. No reasonable jury could have found the undisputed elements unsatified.

#### ***2. Uniclass' Allegedly "Correct Claim Construction" that Excludes Port Occupation Detection Via Message Detection Through the Port is Not a Reasonable "Ordinary Meaning" Interpretation***

The parties' disagreement stems from Mr. Dezmelyk's interpretation of the "ordinary meaning" claim term "detecting whether the first port is occupied" that imports a limitation requiring physical port occupation detection through a mechanism other than the detection of messages flowing through the port. *See* Appx9226 at 100:3-9. The satisfaction of all disputed claim elements rises and falls with Mr. Dezmelyk's unreasonably restrictive interpretation. *E.g.,* Appx9230-9232 at 104:20-106:17.

Turning first to what "the claim language simply requires," it is plain that the claim text neither requires nor excludes any particular mechanism for detecting whether a port is occupied. *Finjan,* 879 F.3d at 1307-09. There is no basis in the claim language to excise the mechanism of determining port occupation via detection of messages received through that port from claim scope.

Mr. Dezmelyk's testimony on the scope of detecting occupation was squarely grounded in his intrinsic evidence-based opinion that ATEN disavowed claim scope. Regarding the '289 patent's disclosure, Mr. Dezmelyk's testimony fell far short of the "exacting standard" required to prove that ATEN disavowed detecting occupation via message detection. *Poly-America*, 839 F.3d at 1136. Although Mr. Dezmelyk contended that the '289 patent did not disclose that the receipt of messages could be used to determine "whether there's a cable there or not," Figure 3 plainly shows a KVM's "Waiting for command from Master" before making a determination whether the "Input port [is] connected [to] a cable =?," Appx39; Appx9226 at 100:3-9; *see also* Appx9223-9225 at 97:19-99:16 (omitting the step when explaining Fig. 3 to the jury); Appx9325-9328 at 199:19-202:6 (confirming the same).

Moreover, the patent does <u>not</u> teach <u>any</u> method to determine whether a port is occupied without message communication, which virtually eliminates the prospect of disavowal based on the patent's disclosure. Appx9486-9487 at 124:15-125:25; Appx41 at 4:57-61, 4:36-38. Mr. Dezmelyk failed to identify any such disclosures in the '289 patent. *Cf.* Appx9326 at 200:5-7; Appx9328 at 202:7-10.

Ultimately, Mr. Dezmelyk offered ample prosecution history testimony to bolster his opinion that ATEN disavowed scope. He testified that, during prosecution, ATEN "argu[ed] that occupied is defined by the fact that there is

cables plugged into that connector," Appx9226-9228 at 100:16-102:12. And, under the guise of a *prima facie* insufficient invalidity case, he testified that ATEN disavowed claim scope, telling the jury, "ATEN told the patent office that their patent was different from the prior art because the prior art cannot distinguish a master from a slave based on whether the out connector was occupied." Appx9268 142:15-22; Appx9268-Appx9277 at 142:10-151:12; Appx9354-9355 at 228:7-229:12; *see* Appx9489-9490 at 127:12-128:9. He even improperly compared prior art directly to the accused device, Appx9228-9229 at 102:14-103:19; *see Cordance,* 658 F.3d at 1335-37.

In view of the '289 patent's disclosure of receiving messages as the only mechanism for detecting port occupation and Dr. Lavian's countervailing testimony on the same[23], no reasonable jury could have found that "clear and unequivocal evidence" supported the notion that ATEN disavowed the use of messages to detect port occupation claim scope. *Poly-America*, 839 F.3d at 1136. *Finjan,* 879 F.3d at 1307-09. Mr. Dezmelyk's restrictive interpretation of "detecting whether the first port is occupied" occupation is not reasonable given the straightforward claim language—and a reasonable jury could not have adopted it. *Finjan,* 879 F.3d at 1307-09.

[23] Appx9480-9484 at 118:18-122:12; Appx9488 at 126:1-13.

### *3. Even Assuming the Jury "Underst[ood] 'Occupation' to Refer to Physical Occupation," the Record Lacks "Substantial Evidence" of Noninfringement in at Least Some Instances*

"It is well settled that an accused device that sometimes, but not always, embodies a claim nonetheless infringes." *Broadcom*, 732 F.3d at 1333 (punctuation omitted).

It is undisputed that in circumstances where "an actual plug in the [IN] port" belongs to a cable attached to the OUT port of a compatible, working Prima T device, the existence of a master KVM is detected by messages transmitted and received through the IN port, and master/slave statuses are intelligently set accordingly. *See* Section II.D.ii.1 above. For example, Mr. Dezmelyk confirmed that a Prima T KVM "simply waits for messages from the other device"—i.*e.,* another Prima T KVM—"in detecting master/slave configuration." Appx9230 at 104:14-16; Appx9228 at 102:19-22; Appx9234 at 108:7-9; *Nobelpharma,* 141 F.3d at 1065.

Logically, this receipt of messages through the IN port (and actions dependent thereon), can only occur when the IN Port is occupied in a specific manner—*i.e.*, by a cable connected to another Prima T. *E.g.,* Appx8577-8578 at 75:13-76:21; Appx8574-8576 at 72:19-74:15 (identifying ports within the Prima T source code). Conversely, the messages cannot possibly be communicated when the port is <u>not</u> occupied. Therefore, the accused devices use the receipt of messages

to "detect[] whether the first port is occupied" in at least *some* instances—*i.e.*, when the port is *meaningfully* occupied by a cable connected to another Prima T. *Id.; see also* Appx8581-8582 at 79:17-80:14; Appx9483 at 121:20-25. There is no substantial evidence to the contrary, only conclusory expert testimony. *E.g.,* Appx9230 at 104:14-16; *Schumer*, 308 F.3d at 1315-16. Thus, the only reasonable conclusion is that the accused devices infringe "at least sometimes." *Broadcom*, 732 F.3d at 1333 (Fed. Cir. 2013).

So long as Mr. Dezmelyk's unreasonable, prosecution history-based interpretation of an "ordinary meaning" claim limitation is not sanctioned by this Court, "the evidence, construed in the light most favorable to [Uniclass], permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hagen*, 736 F.3d at 1256. JMOL of direct infringement of the '289 patent is warranted.

### D. Summary Judgment on Lost Profits Damages Should Be Reversed

If, when viewing the evidence and drawing all reasonable inferences in the light most favorable to ATEN, genuine issues of material fact exist, summary judgment is improper and should be reversed. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To recover lost profits, ATEN "<u>need not negate every possibility</u> that the purchaser might not have purchased a product other than his absent the infringement." *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1141 (Fed. Cir. 1991) (emphasis added); *Del Mar Avionics, Inc. v. Quinton*

*Instr. Co.*, 836 F.2d 1320, 1326 (Fed. Cir. 1987). "[T]he factfinder must have before it such facts and circumstances to enable it to make an estimate of damage based upon judgment, not guesswork." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996) (emphasis added) (internal citations omitted). Indeed, to stave off summary judgment, ATEN only needed to meet the "reasonable probability" standard that, "but for" Uniclass' infringement, it would have made a portion of Uniclass' sales. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995); *see also* Appx7685-7701.

In granting summary judgment, the district court found that Mr. Snell's method of estimating the portion of accused sales that ATEN would have made "but for" Uniclass' infringement "d[id] not embody the use of sound economic principles." Appx22. It foreclosed the availability of lost profits based on his (i) reliance on statements of ATEN witness Mr. Chen, and (ii) his alleged failure to "properly account for the other competitors"—*i.e.,* neither ATEN nor Uniclass—in the U.S. KVM OEM market. *Id*.

#### i. The District Court Erroneously Based its Unsound-Economic-Principles Finding on Mr. Snell's Reliance on Mr. Chen's Statements

Mr. Snell relied on Mr. Chen for information on market competitors—*e.g.*, that ATEN and Uniclass are the "dominant suppliers" in the OEM market—and for comparing or "mapping" ATEN's products to those of Uniclass. Appx21-22.

The district court erroneously found that Mr. Snell used unsound economic principles by exclusively relying on his discussions with Mr. Chen when forming part of his opinion. Specifically, it characterized such reliance as introducing "guesswork" into his analysis:

> Snell "started with the observation from his discussions with Chen that ATEN and Uniclass were the dominant suppliers in the KVM switch OEM market in the United States." He then assumes that ATEN would likely have made these sales. But he conducts no independent analysis in this regard….

Appx22 (citation omitted). Similarly, regarding product "mapping," the district court faulted Mr. Snell for "rel[ying] solely on ATEN [i.e., Mr. Chen] to decide which of ATEN's products are sufficiently similar to Uniclass products to essentially swap them out in the market." *Id*.

But Federal Rule of Evidence 703 provides that an "expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed [] if experts in the particular field would reasonably rely on those kind of facts or data in forming an opinion on the subject." Rule 703 "does not predicate admissibility on the source of the facts or data or, in particular, on whether the source is employed by either of the parties." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014). In fact, it is common for damages experts to rely not only on a party's fact witnesses, but also on "other experts hired by the party they represent for expertise outside of their field." *Id*. And here, where

it was undisputed that specific market data was lacking, it is particularly reasonable for a damages expert to rely on statements of a fact witness—at least at the summary judgment stage.

Ultimately, Defendants would have had the opportunity to probe (and, perhaps, impeach) Mr. Snell's factual basis and assumptions—as well as Mr. Chen underlying statements—at trial through cross-examination. In fact, the uncontradicted trial testimony of Mr. Chen exemplified how ATEN and Uniclass were indeed the "dominant suppliers" in the U.S. KVM OEM market and the other competitors were but minor players. *E.g.*, Appx8431-8484 at 20:25-23:7; Appx8444 at 33:5-9.

Thus, Mr. Snell's reliance on Mr. Chen's statements in forming his lost profits opinion was both permissible and reasonable. Accordingly, the district court erred by basing its unsound-economic-principles finding on such reliance.

#### ii. The District Court Erroneously Based its Unsound-Economic-Principles Finding on Mr. Snell's Alleged Failure to Properly Account For "Other Competitors"

In holding that Mr. Snell used unsound economic principles, the district court also erroneously relied on Mr. Snell's alleged failure to properly account for competitors other than ATEN and Uniclass in the U.S. KVM OEM market.

Mr. Snell expressly acknowledged that such "other competitors" exist in that market. Appx4765 at ¶ 56. Yet, Mr. Snell opined that ATEN and Uniclass were the

market's "dominant suppliers"—implying that the combined market share of these other competitors was negligible—and reasonably concluded that ATEN would have made the sales of six "mapped" Uniclass accused products "but for" its infringement. Appx4767-4771.

However, the district court improperly found Mr. Snell's analysis unsound because his expert report

> d[id] not quantify what "dominant suppliers" means. As observed by Defendants, "dominant" could mean that ATEN and Uniclass represent 50% of the market and all the other competitors represent the other 50%. Snell makes no effort to account for other competitors, but claims ATEN would have made all of Uniclass' accused sales for the six identified products.

Appx22. The district court also found his product "mapping" incomplete because "ATEN and Snell would need to map other competitor products in the [OEM market] that also correspond to the Uniclass and ATEN products. Snell's mapping methodology does not overcome the existence of other competitors in the KVM OEM market." *Id*.

Ultimately, whether Mr. Snell properly accounted for these other competitors turns on the size of the other competitors' market shares and the products they offered in that market. These are clear issues of fact that should have been properly left for the jury to decide. *See Apple*, 757 F.3d at 1314 ("A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge

credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder.”). Moreover, as noted above, both Mr. Snell and Mr. Chen were available for cross-examination at trial, where Mr. Chen gave uncontradicted testimony on the U.S. KVM OEM market. Appx8431-8484 at 20:25-23:7; Appx8444 at 33:5-9.

Had the relevant segments of the U.S. KVM OEM market included any unaccounted-for non-negligible competitors, summary judgment might have been appropriate—but that is not the case. Indeed, Uniclass offered no evidence suggesting that it is. Rather, consistent with Mr. Chen’s uncontroverted trial testimony and Mr. Snell’s report, the relevant market *is essentially* a two-competitor market of ATEN and Uniclass, rendering reasonable Mr. Snell’s accounting of the “other competitors” in his but-for analysis. *See Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999) (“[C]ourts have given patentees significant latitude to prove and recover lost profits for a wide variety of foreseeable economic effects of the infringement.”).

Moreover, at the summary judgment stage, a court “does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial.” *House v. Bell*, 547 U.S. 518, 559-60 (2006). Because the other competitors’ market share and the products they offered in that market “affect the outcome of the suit” in that they are necessary to prove ATEN’s lost

profits claim, and because sufficient evidence exists for a reasonable jury to decide these issues in ATEN's favor, these were material and genuine factual issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when viewing the evidence and drawing all reasonable inferences in the light most favorable to ATEN, summary judgment on ATEN's lost profits claim was improper and should be reversed. Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322-23.

## V. CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the above-mentioned reasons, ATEN respectfully requests from this Court the following relief:

(1) reverse the judgment of invalidity of the '141 patent;

(2) reverse the judgments of noninfringement as to the '141 and '289 patents, or alternatively, vacate such verdicts and remand for a new trial; and

(3) reverse summary judgment on ATEN's lost profits damages, and remand for a new trial on damages.

Dated: April 27, 2018 Respectfully submitted,

/s/ Laurence M. Sandell
Laurence M. Sandell
Lei Mei
*Counsel of Record*
MEI & MARK LLP
818 18th Street NW, Suite 410
Washington, DC 20006
Telephone: (888) 860-5678 x717
lsandell@meimark.com

*Counsel for Appellant ATEN Int'l Co., Ltd.*

# ADDENDUM

a. Opinion and Order by the district court regarding motion for JMOL and alternative motion for a new trial (Appx1-13)

b. Judgment by the district court (Appx14-17)

c. Opinion and Order by the district court regarding Uniclass' motion for summary judgment on ATEN's lost profits damages (Appx18-23)

d. U.S. Patent No. 8,589,141 (Appx24-35)

e. U.S. Patent No. 6,640,289 (Appx36-43)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

| | |
|---|---|
| Present: The Honorable | ANDREW J. GUILFORD |

| | | |
|---|---|---|
| Lisa Bredahl | Not Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |

**Proceedings:** **[IN CHAMBERS] ORDER RE PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(b) AND ALTERNATIVE MOTION FOR A NEW TRIAL (DKT. 462)**

Before the Court is Plaintiff ATEN International's ("ATEN") Motion for Judgment as a Matter of Law ("JMOL") or alternatively for a new trial. (Dkt. 462.)

The Motion is GRANTED concerning validity of the '217 Patent and otherwise DENIED.

## 1. BACKGROUND

In June 2015, ATEN filed this case for patent infringement against Defendants Uniclass Technology Co., Ltd. ("Uniclass"), Electronic Technology Co., Ltd. of Dongguan Uniclass, Airlink 101, Phoebe Micro Inc., Broadtech International Co., Ltd. D/B/A/ Linkskey, Black Box Corporation, and Black Box Corporation of Pennsylvania ("Other Defendants") (collectively, "Defendants"). ATEN alleged that Defendants either directly or indirectly infringed claims of four patents: U.S. Patent No. 8,589,141 ("the '141 Patent"); U.S. Patent No. 7,640,289 ("the '289 Patent"); U.S. Patent No. 7,472,217 ("the '217 Patent"); and U.S. Patent No. 6,957,287 ("the '287 Patent") (collectively, "Asserted Patents"). Defendants filed counterclaims of non-infringement and invalidity of the Asserted Patents.

The case proceeded to a jury trial on September 19, 2017. During trial, Plaintiff raised a Rule

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

50(a) motion for JMOL, which the Court denied. (Dkt. 438 (Rule 50(a) JMOL filed 9/28/2017); Dkt. 442; Trial Tr. 9/28/2017, 4:9–21.) On October 4, 2017, the jury returned a verdict finding 1) Defendants did not infringe any claims of the Asserted Patents and 2) the asserted claims of the '141 Patent and '217 Patent were invalid. (Dkt. 448.) On the verdict form, the jury wrote that the '141 Patent was invalid on the basis of anticipation and the '217 Patent was invalid on the basis of obviousness. (*See id.* at 4)

ATEN renews its JMOL motion or alternatively requests a new trial on all grounds, seeking a ruling that 1) the '141 Patent and '217 Patent are not invalid; 2) Defendants directly, indirectly, and willfully infringed each of the Asserted Patents; 3) Plaintiff is entitled to damages against all Defendants. (*See generally*, Dkt. 462.)

## 2. LEGAL STANDARD

Under Federal Rule of Civil Procedure 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the Court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment–or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged–the movant may file a renewed motion for judgment as a matter of law." When considering this Motion, the Court "must decide whether the evidence construed in the light most favorable to the nomoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Theme Promotions, Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 999 (9th Cir. 2008); *see also Acosta v. City of Costa Mesa,* 718 F.3d 800, 828 (9th Cir. 2013).

"A jury's verdict must be upheld if it is supported by 'substantial evidence.'" *SEC v. Todd,* 642 F.3d 1207, 1215 (9th Cir. 2011) (citing *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir. 1994)). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Todd,* 642 F.3d at 1215 (quoting *Wallace v. City of San Diego,* 479 F.3d 616, 624 (9th Cir. 2007) and *Paradise Valley,* 251 F.3d at 1227). In making this determination, "[t]he court must not weigh the evidence, but rather should ask whether [the nonmoving party] has presented sufficient evidence to support the jury's conclusion." *Todd,* 642 F.3d at 1215 (citing *Paradise Valley,* 251 F.3d at 1227–28). The court must "disregard all evidence favorable to the moving party that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

the jury is not required to believe." *See Wallace v. City of San Diego,* 479 F.3d at 624. Further, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Todd,* 642 F.3d at 1215.

Under Rule 59, a trial court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Specifically, a court may grant a new trial "only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Shimko v. Guenther,* 505 F.3d 987, 993 (9th Cir. 2007) (internal quotations omitted). This determination is left to the sound discretion of the trial court. *See Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278 (1989). Such a motion may be granted on insufficiency of evidence grounds "only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *Incalza v. Fendi N. Am., Inc.,* 479 F.3d 1005, 1013 (9th Cir. 2007) (internal quotation marks omitted). The task of weighing conflicting evidence and making credibility determinations is the job of the jury and not the court. *Lucent Techs., Inc. v. Microsoft Corp.,* 387 F. Supp. 2d 1107, 1126 (S.D. Cal. 2011). Thus, courts will grant motions for a new trial only when the court has given full respect to the jury's findings, but is left with the firm conviction that a mistake has been made. *Landes,* 833 F.2d at 1371–72; *see also Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 510 n.15 (9th Cir. 2000).

## 3. ANALYSIS

### 3.1 Waiver by Failure to Raise Arguments During Trial

Defendants argue that ATEN has waived certain of its JMOL arguments because it did not raise them in its Rule 50(a) motion during the trial. *See* Fed. R. Civ. P. 50(b) (party may *renew* motion for judgment as a matter of law after verdict). The Court finds most of the issues raised by ATEN in its JMOL were adequately raised during trial. Specifically, in its written Rule 50(a) motion for JMOL during trial, ATEN stated, "evidence in the trial compels a finding that Defendants have not proven invalidity by clear and convincing evidence" for the asserted claims of the '141 and '217 Patents. (*See* Dkt. 438 at 2.) ATEN provided similar general statements regarding direct, indirect, and willful infringement, as well as damages. (*Id.* at 4–7.) Given the tenor of those general statements, the fact that ATEN referenced

particular exemplary grounds for JMOL based on, for example, particular references does not preclude ATEN from seeking JMOL on other grounds for the listed causes of action. The Court does find one ground for waiver of some of Plaintiff's JMOL infringement arguments, but that will be addressed in another section.

**3.2 Invalidity**

**3.2.1 The '141 Patent**

At trial, Defendants presented two theories for anticipation of the '141 Patent: 1) anticipation by ATEN's CS-1762 device and/or accompanying user manual (Ex. 1585) and 2) anticipation by Great Britain Patent No. 2,352,540 ("GB '540," Ex. 1728).

ATEN's argument for JMOL concerning the first ground is that there was no evidence in the trial record to show that ATEN's CS-1762 device and manual predated the critical date for the '141 Patent. (*See* Dkt. 467 at 5–6.) In other words, ATEN disputes that the CS-1762 device is prior art. The critical date for the '141 Patent is July 24, 2006, one year before its filing date. (Tr. 9/27/2018 at 176:22–177:3.) Defendants' expert, Dezmelyk, testified that he tested a C-S1762 device with a specific firmware version, v. 1.4.132. (*Id.* at 187:9–17.) He testified that he "looked on the wayback machine to find when that firmware update came out and the last time it was changed, and that was in 2006. So this firmware is prior art firmware operating on this, the test hardware." (*Id.*) As Plaintiff's counsel clarified with Dezmelyk on cross-examination, Dezmelyk did not testify as to a particular month for when the firmware update came out. (*Id.* at 212:18–20.) Plaintiff, however, has not pointed to any conclusive evidence or testimony from trial to support the theory that the firmware was not prior art because it was not released until after the critical date. Notably, the CS-1762 device is *ATEN's* device, not simply a third party reference. This fact was clearly on the record at trial, and ATEN's failure to rebut Dezmelyk's testimony at trial with evidence of a particular date for the firmware update is noteworthy. As noted, the Court must construe the evidence in the light most favorable to Defendants and must grant Plaintiff's Motion if the only reasonable conclusion is contrary to the jury's verdict. *Acosta,* 718 F.3d at 828; *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."). Here, the jury could reasonably conclude

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

based on Dezmelyk's testimony (and the lack of contrary evidence in the record from ATEN) that the firmware Dezmelyk tested predated the '141 Patent's critical date. Thus, substantial evidence supports the jury's verdict.

At the hearing on the JMOL Motion, Plaintiff's counsel placed great emphasis on Dezmelyk's statement that, "under the correct claim construction that I've presented that results in noninfringement . . . the '141 Patent [is] not invalid over the prior art." (Tr. 9/27/2017 at 190:14–191:25.) According to Plaintiff's counsel, under the proper construction of the terms of the '141 Patent, both experts thus agreed that the '141 Patent was valid. Plaintiff's papers raised this argument primarily as a basis to argue JMOL of infringement of the '141 Patent rather than as a basis to argue patent validity. Thus, this argument is addressed in greater detail in the infringement section of this Order. But the Court's analysis is applicable to this section as well, and the Court finds the argument fails for the same reasons.

"[W]here there are two alternative factual theories which might support the verdict, the verdict will be upheld if there is sufficient evidence to support either theory." *Baumler v. State Farm Mut. Auto. Ins. Co.*, 493 F.2d 130, 134 (9th Cir. 1974). Because ATEN's JMOL argument regarding the CS-1762 device/manual is rejected and there is sufficient evidence to support Defendants' anticipation theory (*see* Tr. 9/27 at 176:15–179:11; 181:1–190:3; 153:1–166:21), the Court does not address ATEN's arguments regarding the second theory.

### 3.2.2 The '217 Patent

Defendants' obviousness theory for the '217 Patent was that it would have been obvious at the time the invention was made for a person of skill in the art to combine GB '540 and U.S. Patent No. 6,549,966 ("Dickens", Ex. 1704).

ATEN's argument for JMOL raises two points, alleging: "(1) 'conclusory statements' regarding element 1.6, [and] (2) a generic motivation to combine" (Dkt. 467 at 8 (citing Dkt. 462-1 at 6–9).) ATEN further argues that it's alternatively entitled to a new trial because it was not allowed to present evidence of secondary considerations to the jury. (Dkt. 462-1 at 2, 10.) Although Defendants specifically addressed ATEN's second and third points in their papers, Defendants did not respond to ATEN's "conclusory statements" argument in their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

Opposition. ATEN argues Defendants have "effectively conceded" this argument. (Dkt. 467 at 8.)

Element 1.6 of the '217 Patent states,

> wherein control of the one or more than one peripheral device can be maintained by one of the plurality of computer systems even while the video monitor, the keyboard and the mouse are controlling another one of the plurality of computer systems

In his direct testimony, Defendants' counsel asked Dezmelyk only a single question about element 1.6:

> Q. … Mr. Dezmelyk, did you -- were you able to determine whether that limitation was also disclosed in the GB540 reference?
>
> A. Yes. That limitation is disclosed in that in this particular design, you can switch -- from one of the consoles you can switch without switching the peripherals. In other words, you can leave the peripherals undisturbed while you switch around to the different monitors or the different computers.

(Tr. 9/27/2017, 171:14–172:3.) At the hearing, Defendants' counsel argued that their Opposition identified--by string citation--all of the evidence submitted at trial to support a finding that the '217 Patent was obvious. Defendants' counsel further attempted to justify the conclusory tenor of Dezmelyk's statement by arguing that in the interests of time, they did not ask Dezmelyk more questions on this issue because they believed it would be duplicative of testimony and evidence from other witnesses. Defendants did not otherwise point to specific evidence in the record where Dezmelyk or someone else explained in more detail why element 1.6 was disclosed by the GB '540 reference. Nor did Defendants attempt to further explain the adequacy of Dezmelyk's single statement about element 1.6.

Plaintiff's counsel argued that Dezmelyk made contrary statements about whether GB '540 disclosed this limitation during cross-examination:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

> Q. . . . So when the switch -- when the box 200 has been switched away from one PC to another, the keyboard and the mouse and then the speakers and the printer are all going to move from one PC to another; correct?
>
> A. Correct. The transition of the switch between that set of elements, they move together or synchronously as used in some of these patents.

(Tr. 9/27/2017, 218:10–16.) Given Dezmelyk's conclusory statement during direct examination and conflicting statements during cross examination, Plaintiff argues that JMOL is appropriate. Plaintiff also directs the Court to an opinion where the Federal Circuit vacated a district court's grant of summary judgment of invalidity. *See* Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304 (Fed. Cir. 2002) The district court in *Schumer* had relied on declaration testimony from Dezmelyk--the same expert who testified in this case--when it had found the asserted patents invalid. The Federal Circuit stated,

> [i]t is not our task, nor is it the task of the district court, to attempt to interpret confusing or general testimony to determine whether a case of invalidity has been made out, particularly at the summary judgment stage. Indeed, to accept confusing or generalized testimony as evidence of invalidity is improper. The risk is great that the confusion or generality is the result, not of an inarticulate witness or complex subject matter, but of a witness who is unable to provide the essential testimony. Here both of Dezmelyk's declarations lack the requisite clarity. Dezmelyk merely sets forth his understanding of the operation and steps performed by the [prior art reference] and describes what he considered to be known to one of ordinary skill prior to [Plaintiff's] invention. He does not clearly describe the operative steps of the method recited in claim 13, nor how those operative steps are performed by the [prior art reference].

*Schumer*, 308 F.3d at 1316.

It's notable that the Federal Circuit in *Schumer* was addressing a summary judgment motion rather than a question of judgment as a matter of law after a jury verdict. But the Federal Circuit's statements are still instructive. The record here is noticeably thin, and Defendants' attempt to shed light on the issue after the fact are even thinner. Even considering the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

evidence in the light most favorable to Defendants, there is not substantial evidence to support the jury's finding that Defendants proved invalidity of the '217 Patent by clear and convincing evidence. Dezmelyk's one statement regarding element 1.6 during direct examination does not even fully track the language in the claim or explain beyond conclusory statements how the claim language is specifically met by the prior art. Unlike establishing a priority date, whether the GB '540 reference disclosed the complex subject matter recited in the '217 Patent required Defendants to "clearly describe the operative steps . . . [and] how those operative steps are performed" by GB '540. *Id.* Because there is a lack of sufficient evidence in the record regarding element 1.6, the only reasonable conclusion is contrary to the jury's verdict. The Court finds JMOL of no invalidity is appropriate on the current record.

### 3.3 Infringement

A critical point colors the Court's review of Plaintiff's JMOL infringement arguments: it is Plaintiff's burden, by a preponderance of the evidence, to prove infringement at trial. *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005). Indeed, Plaintiff is adamant in its JMOL that it had a "confused jury" on its hands. (*See, e.g.*, Dkt. 467 at 1.) But again: *Plaintiff* bore the burden of proving infringement. A claim of "jury confusion" first and foremost supports an argument that Plaintiff failed to meet that burden. Further, at the outset of each of its infringement arguments, Plaintiff states the evidence at trial "compels a finding" of infringement. (*See, e.g.*, Dkt. 462-1 at 9, 12, 15, 20.) Plaintiff then cites a string of exhibits and large chunks of trial transcript lines. (Ironically, Plaintiff challenges Defendants' non-infringement position in opposition for at least one of the patents as offering "no more than a disembodied string cite of USB specifications, manuals, and circuit schematics . . . without any intelligible context, argument, or references to its expert's testimony." (Dkt. 467 at 11.)) Nowhere in Plaintiff's JMOL does Plaintiff actually identify the particularized testimony and evidence submitted at trial to support its bid for infringement of *each* limitation of *each* asserted claim of the Asserted Patents. Moreover, the jury was free to reject Plaintiff's proffered evidence and testimony of infringement. Without a further affirmative showing from Plaintiff that its evidence "compels" a finding of infringement, its arguments about how Defendants failed to prove non-infringement turn the burden of proof on its head and are insufficient to overturn the jury's verdict.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

Even so, it's worth discussing some of Plaintiff's JMOL arguments for the '141 and '289 Patents more closely. Specifically, Plaintiff argues that Dezmelyk presented his own claim construction arguments to the jury for these patents. (*See* Dkt. 462-1 at 9–15.) Plaintiff argues that Dezmelyk provided his own construction for the "disconnecting . . ." term in the '141 Patent and the "detecting . . ." term in the '289 Patent.

Leading up to trial, the Court construed the "disconnecting . . ." term in the '141 Patent by rejecting Defendants' proposed construction and finding the term should be given its plain and ordinary meaning as Plaintiff proposed. (Dkt. 226 at 15–17.) The parties did not seek construction of the "detecting . . ." term of the '289 Patent. (*See generally*, Dkt. 190.) From claim construction onward, neither party argued that there was a misunderstanding of the meaning of the Court's construction by the other side or a misunderstanding of the meaning of these terms generally. In other words, there were no motions *in limine*, *Daubert* motions, or summary judgment motions that might have brought these issues to the Court's attention. At trial, both parties' experts testified to their understanding of the plain and ordinary meaning of these terms.

Notably, the record shows not a single objection from Plaintiff's counsel on claim interpretation grounds until after both Lavian and Dezmelyk had concluded their case-in-chief testimony. Indeed, Plaintiff solicited testimony from Dezmelyk regarding proper claim interpretation on cross-examination. Finally, at the end of the seventh day of trial, after the conclusion of all of Dezmelyk's testimony on direct, cross, and redirect, Plaintiff moved for a "post-testifying Daubert on Dezmelyk's ***testimony on invalidity with respect to anything that required an ATEN claim construction***." (Tr. 9/27/2017, 231:23–232:6 (emphasis added).) In other words, Plaintiff did not object to Dezmelyk's testimony regarding non-infringement. Nor did Plaintiff seek clarification of claim scope or claim construction from the Court. Instead, Plaintiff's sole objection was that Dezmelyk had testified using *Plaintiff's expert's* plain and ordinary interpretation of the claims for purposes of some of his arguments. This is a separate concern from the issue of whether the Court has failed as a matter of law to adequately construe the claims. And moreover, when it comes to patent infringement and invalidity, the question of whether an expert may testify by relying on another expert's claim interpretation assumptions is an issue that should be raised with the Court and addressed *before* trial. Indeed, in at least one case, the Federal Circuit has condoned the testimony of an expert who "mapped each element of the asserted claims to the functionality of [a prior art

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

reference] in a manner that mirrored [the other side's] infringement theory." *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1335 (Fed. Cir. 2011). The Court thus rightfully denied Plaintiff's "post-testifying Daubert" the following day. *See also Nobelbiz, Inc. v. Glob. Connect, L.L.C.*, No. 6:12-CV-244-RWS, 2015 WL 11089488, at *3 (E.D. Tex. July 16, 2015)("[Defendant's expert] is permitted to analyze the 2004 prior art systems in accordance with the claim interpretations put forth by [Plaintiff], subject to the claim constructions adopted by this Court."); *Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 943 (N.D. Cal. 2015)("[Defendant's expert] does not argue that the [asserted patent] is invalid because the prior art is identical to an infringing product . . . Rather, he assumes that [Plaintiff's] understanding of the construed claims is correct, and then proceeds to demonstrate how, in his opinion, each element of the claims is found in the prior art."); *HSM Portfolio LLC v. Elpida Memory Inc.*, 160 F. Supp. 3d 708, 725–26 (D. Del. 2016) ("The case does not preclude parties from arguing that if a claim limitation must be interpreted in a certain fashion to read on the accused products, then—if interpreted that same way—the claim reads on the prior art.")

By failing to raise concerns regarding the proper construction of claim terms at trial itself, Plaintiff has effectively waived any challenge based on an improper claim construction. *TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1363 (Fed. Cir. 2017) (affirming denial of JMOL and new trial and noting that party "did not seek construction of any of the three terms at trial" and "litigants waive their right to present new claim construction disputes if they are raised for the first time after trial.") (quoting *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358–59 (Fed. Cir. 2006)); *see also LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1322 (Fed. Cir. 2016). Indeed, at the hearing on Plaintiff's JMOL Motion, Plaintiff's counsel seemed to state that Plaintiff was not attempting to raise an argument that the Court had failed to construe claim terms, at least as far as the '141 Patent. In any event, any attempt to challenge Dezmelyk's testimony as improper claim construction at this late stage would be rejected. "While the Court functions as a gatekeeper, it is the litigant's responsibility to raise issues they believe warrant gatekeeping in a timely manner at an appropriate stage in the case." *Chrimar Sys., Inc. V. Alcatel-Lucent Enterp. USA Inc.*, No. 6:15-cv-00163-JDL, 2017 WL 568712, at *6 (E.D. Tex. February 3, 2017)

Plaintiff might argue that it adequately raised a claim construction argument for the '289 Patent based on its Rule 50(a) Motion. (Dkt. 438.) Plaintiff's counsel did not raise this issue

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

at the hearing. In its Rule 50(a) Motion, Plaintiff states, ". . . the '289 patent does teach detecting whether the port is 'occupied' through communication. Defendants made no argument of non-infringement under the correct interpretation of the term 'occupied.'" (*Id.* at 4.) This is a term that neither party asked the Court to construe at any point during this litigation. For a party to say they've adequately raised a claim construction issue by implying it for the first time in a Rule 50(a) motion on the final day of an eight day jury trial is unpersuasive. *See, e.g.*, *LifeNet Health v. LifeCell Corp.*, 837 F.3d 1316, 1322 (Fed. Cir. 2016) ("Here, in light of LifeCell's failure to sufficiently request further construction of the relevant limitation leading up to and during trial, we find that it fails to properly raise an *O2 Micro* issue.") Moreover, Plaintiff's Rule 50(a) argument was insufficient to raise a question of claim construction as opposed to a factual question of understanding the plain and ordinary meaning of the claim terms and applying that meaning to the accused products. The '289 Patent relies on "technical words or phrases not commonly understood." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015). In the face of such a factual dispute and no prior objection from either party, it was necessary for the Court to hear and consider the opposing testimony of the parties' experts as to the proper interpretation of the term "occupied." *See id.* After hearing the evidence from both sides and receiving the jury's verdict, the Court agrees with the jury's finding of non-infringement and any assumed subsidiary factual conclusion that flows from that finding regarding the meaning of this claim term. Specifically, Dezmelyk explained his argument that a person of skill in the art would understand "occupation" to refer to physical occupation and his further explanation that "the Prima T device never looks at whether there's actually a cable in the port. It simply waits for messages from the other device." (Tr. 9/27/2017 at 105:10–11.) Plaintiff insists that even under Defendants' interpretation of the claims, the evidence at trial still compels a finding of infringement. (Dkt. 467 at 14–15.) The Court disagrees. Substantial evidence supports the jury's finding and the jury was free to disregard the evidence Plaintiff raises in JMOL to the contrary.

The Court also rejects Plaintiff's argument that the jury's verdict of 1) invalidity of the '141 Patent and 2) non-infringement of the '141 Patent is a "logical impossibility." (*See* Dkt. 462-1 at 12.) Plaintiff again points to the testimony of Dezmelyk to support this argument, where Dezmelyk stated, "under the correct claim construction that I've presented that results in noninfringement . . . the '141 Patent [is] not invalid over the prior art." (Tr. 9/27/2017 at 190:14–191:25.) Plaintiff's argument that the verdict is inconsistent places heavy emphasis on

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

this single statement from an expert when the parties spent significant time and effort presenting their positions as to infringement and invalidity at trial. It also ignores the fact that the same party does not bear the burden of proof for both infringement and invalidity. Indisputably, whether or not *Plaintiff* proved infringement is a separate issue from whether or not *Defendants* proved invalidity. Indeed, Plaintiff acknowledges that the Court instructed the jury that these were distinct inquiries. (Dkt. 452 at 46–47.)

Even assuming that the jury considered Dezmelyk's statement about the "correct claim construction," the jury's verdict of invalidity of the '141 Patent indicates that the jury rejected Dezmelyk's interpretation of the claims in favor of the interpretation submitted by ATEN. Indeed, as previously noted, for purposes of conducting his invalidity analysis, Dezmelyk assumed ATEN's interpretation of the claims. But by rejecting Dezmelyk's interpretation of the claims in favor of ATEN's interpretation, there was still no obligation for the jury to find that Plaintiff had met its burden of proving infringement. Specifically, even assuming the jury affirmatively rejected Dezmelyk's interpretation in favor of Plaintiff's interpretation of "connecting . . ." in finding the '141 Patent invalid, the jury still could still have reasonably credited Dezmelyk's testimony that the Accused Products continuously emulate and thus the "*starting* emulating the input device to the first host"(after disconnecting the input device) limitation is not met. (*See* Tr. 9/27/2017 at 111:14–112:3 ("The way these devices work is they always emulate. . . . So there is never those steps of . . . emulating sometimes and not emulating other times.").) Substantial evidence thus supports the jury's verdicts for the '141 Patent under a consistent interpretation of the patent's claims. *TVIIM*, 851 F.3d at 1365.

At the hearing, Plaintiff's counsel changed course and used similar arguments to assert that at trial, both parties' experts had argued that under a "proper construction" of the claims, the '141 Patent was not invalid. Plaintiff's counsel thus characterized the issue as both experts agreeing that the '141 Patent was not invalid under the Court's claim construction and requesting that the Court strike any reference to some alternative construction. Plaintiff's argument, however, ignores the fact that the parties' experts had divergent view of the proper interpretation of the claims. The issue was not that both experts agreed to a single interpretation of the claims and that under that single interpretation, both experts agreed the '141 Patent was not invalid. Plaintiff's argument is thus rejected.

Plaintiff does not make similar claim construction arguments for the '287 and '217 Patents. Plaintiff's arguments regarding the '287 and '217 Patents essentially boil down to arguments

Case: 18-1606 Document: 14 Page: 91 Filed: 04/27/2018

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | January 22, 2018 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

about the sufficiency of Dezmelyk's evidence of non-infringement as compared to the sufficiency of Lavian's testimony. The Court has considered each parties' short arguments regarding these two patents and the evidence submitted. Again, the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *See Wallace v. City of San Diego,* 479 F.3d at 624. Plaintiff has not presented any evidence that the jury was required to believe, and its arguments accordingly fail. The Court further concludes that substantial evidence supports each non-infringement finding.

### 3.4 Indirect Infringement, Willful Infringement, and Damages

Since the Court declines to overturn the jury's verdict of non-infringement for the four Asserted Patents, Plaintiff's JMOL arguments regarding indirect infringement, willful infringement, and damages also fail.

## 4. CONCLUSION

ATEN's request for JMOL is GRANTED as to the issue of the validity of Claims 1, 3, and 4 of the '217 Patent. The jury's verdict that the '217 Patent was invalid as obvious is not supported by substantial evidence in the record, and specifically, there is insufficient evidence in the record to support a finding that element 1.6 of Claim 1 of the '217 Patent was disclosed by GB '540.

ATEN has otherwise failed to show that the verdict is unsupported by sufficient evidence and that the only reasonable conclusion as to the verdict is contrary to the verdict. *See Theme Promotions, Inc.,* 546 F.3d at 999. ATEN has further failed to show that the "verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or [that the Motion should be granted] to prevent a miscarriage of justice." *Shimko,* 505 F.3d at 993. The remainder of ATEN's Motion (Dkt. 462) is DENIED.

Jen-Feng Lee, SBN 204328 (jflee@ltpacificlaw.com)
Kenneth K. Tanji, Jr., SBN 162273 (ktanji@ltpacificlaw.com)
LT PACIFIC LAW GROUP, LLP
17800 Castleton Street, #560
City of Industry, CA 91748
T: 626-810-7200
F: 626-810-7300

Robert Aycock (Admitted Pro Hac Vice) (raycock@pa-law.com)
Joseph G. Pia (Admitted Pro Hac Vice) (joe.pia@pa-law.com)
PIA ANDERSON MOSS HOYT
136 East South Temple, 19th Floor
Salt Lake City, UT 84111
Telephone: (801) 350-9000
Facsimile: (801) 350-9010

Attorneys for Defendants

**JS-6**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

ATEN INTERNATIONAL, CO. LTD.

Plaintiff,

vs.

UNICLASS TECHNOLOGY CO., LTD., et al.

Defendants.

No. 2:15-cv-04424-AJG-AJW

**JUDGMENT**

Hon. Andrew J. Guilford

This action came before the Court for trial by jury beginning September 19, 2017 before a duly impaneled and sworn jury. The parties to the action are plaintiff ATEN International Co., Ltd. ("ATEN") and defendants Uniclass Technology Co., Ltd. ("Uniclass"), Electronic Technology Co., Ltd. of Dongguan Uniclass, Airlink 101, Phoebe Micro Inc., Broadtech International Co., Ltd. D/B/A Linkskey, Black Box Corporation, and Black Box Corporation of Pennsylvania (the "Other Defendants") (collectively, "Defendants"). The issues have been tried, and the jury rendered a verdict on October 4, 2017. The verdict was accepted by the Court and filed by the Clerk. (Dkt. 457.)

Therefore, pursuant to Rule 58 of the Federal Rules of Civil Procedure, JUDGMENT is hereby entered in this matter as follows:

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to direct and literal infringement and infringement under the doctrine of equivalents of claims 1-20 of U.S. Patent No. 7,640,289 ("the '289 patent").

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to indirect infringement of claims 1-20 of the '289 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to willful infringement of claims 1-20 of the '289 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to direct and literal infringement and infringement

under the doctrine of equivalents of claim 5 of U.S. Patent No. 6,957,287 ("the '287 patent").

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to indirect infringement of claim 5 the '287 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to willful infringement of claim 5 the '287 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to direct and literal infringement and infringement under the doctrine of equivalents of claims 1, 3, and 4 of U.S. Patent No. 7,472,217 ("the '217 patent").

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to indirect infringement of claims 1, 3, and 4 of the '217 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to willful infringement of claims 1, 3, and 4 of the '217 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to direct and literal and infringement under the doctrine of equivalents infringement of claims 3, 8, and 10 of U.S. Patent No. 8,589,141 ("the '141 patent").

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of

noninfringement with respect to indirect infringement of claims 3, 8, and 10 of the ’141 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN of a finding of noninfringement with respect to willful infringement of claims 3, 8, and 10 of the ’141 patent.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN that Defendants did prove invalidity of claims 1, 3, and 4 of the ’217 patent based upon obviousness.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and against ATEN that Defendants did prove invalidity of claims 3, 8, and 10 of the ’141 patent based upon anticipation.

IT IS FURTHER ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of Defendants and that Defendants do not owe any damages to ATEN.

**IT IS SO ORDERED.**

Dated: December 12, 2017

Hon. Andrew J. Guilford
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | April 24, 2017 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

| | | |
|---|---|---|
| Present: The Honorable | ANDREW J. GUILFORD | |
| Lisa Bredahl | Not Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |

**Proceedings:** **[IN CHAMBERS] ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ATEN'S LOST PROFITS DAMAGES (DKT. 265)**

Defendants Uniclass Technology Co., Ltd., Electronic Technology Co., Ltd. of Dongguan Uniclass, Airlink 101, Phoebe Micro Inc., Broadtech International Co., Ltd. D/B/A Linkskey, Black Box Corp., and Black Box Corp. of Pennsylvania (Collectively, "Uniclass" or "Defendants") ask the Court for summary judgment that Plaintiff ATEN Technology, Co. Ltd. ("ATEN" or "Plaintiff") is not entitled to lost profits damages. More accurately, this is a *partial* summary judgment.

The Court **GRANTS** the Motion.

## 1. BACKGROUND

The parties are in the business of selling keyboard-video-mouse ("KVM") switches. A KVM switch system is a signal switch that allows a single user or multiple users to share a single keyboard, video device, and mouse. (Dkt. 265 at 4.) ATEN accuses certain Uniclass KVM switches of infringing its patents. The customer defendants in this case (Airlink, Broadtech, and Black Box) are Uniclass customers that purchased Uniclass KVM switches accused by ATEN of infringing the patents-in-suit.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | April 24, 2017 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

## 2. LEGAL STANDARDS

### 2.1 Summary Judgment

Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). At the summary judgment stage, a court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," such as those necessary to the proof of a defense or a claim, and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

"Summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted). If the non-moving party fails to produce enough evidence to show a genuine issue of material fact, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322-23.

### 2.2 Lost Profits

To recover lost profits for patent infringement, the patentee must show a reasonable probability that, "but for" the infringement, it would have made the infringer's sales. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). The "but for" analysis involves a consideration of the market as it would have developed absent the infringing product to determine what profits the patentee would have made. *Grain Processing Corp. v. Am. Maize-*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | April 24, 2017 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

*Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). "Thus, the fact finder's job is to determine what would the patent holder have made (what would his profits have been) if the infringer had not infringed." *Mentor Graphics Corp. v. EVE-USA Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017).

An accepted, "but non-exclusive" method for establishing "but-for" causation is the four-factor *"Panduit* test," where the patentee must prove:

(1) demand for the patented product;
(2) absence of acceptable non-infringing alternatives;
(3) manufacturing and marketing capability to exploit the demand; and
(4) the amount of profit it would have made.

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d at 1545 (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir. 1978)).

**3. ANALYSIS**

"The availability of lost profits is a question of law for the court, not the jury." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004). Defendants argue that ATEN's claim for lost profits damages fails as a matter of law for two primary reasons: (1) ATEN's damages expert allegedly failed to make an adequate market share analysis; and (2) ATEN cannot satisfy the second element of Panduit, the absence of non-infringing substitutes.

**3.1 Lack of Market Share Analysis**

Defendants first argue that ATEN did not undertake a meaningful market analysis that would support a lost profits calculation. The Court agrees. Before diving into the details, it is helpful to establish some relevant facts for context.

Uniclass sells accused KVM switches primarily in the original equipment manufacturer ("OEM") market. (Dkt. 265-2, SOF ¶ 80.) ATEN's damages expert, Jeffrey Snell, asserts that "[i]n this case, the market at issue is the OEM market for KVM switches in the U.S." (Dkt.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-04424-AG (AJWx) | Date | April 24, 2017 |
|---|---|---|---|
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

297-2 at 17.) In this OEM market, KVM switch customers (such as Airlink, Broadtech, and Black Box) buy KVM switches manufactured by OEMs (such as Uniclass) and then distribute and sell these KVM switches to other distributors or end consumers under the customer's own brand name. (Dkt. 265-2, SOF ¶ 81.)

Importantly, Uniclass and ATEN are not the only KVM switch manufacturers that compete in the KVM switch OEM market in the United States. Uniclass has identified at least a handful of KVM switch manufacturers in Taiwan that compete with ATEN and Uniclass in the KVM switch OEM market. (Dkt. 265, Ex. 1 at 17.) Representatives from StarTech, a Uniclass customer that purchased accused KVM switches, informed Uniclass that it also purchased KVM switches from a company called Rextron Technology, Inc. (*Id.*, Ex. 1. at 16-17.)

ATEN's damages expert, Snell, concedes that there are competitors in addition to ATEN and Defendants in the KVM switch market in the United States:

> It is my understanding from Mr. Chen that the accused products compete with ATEN's products **as well as third parties' products**. In such circumstances, it is my understanding that a market share approach may be used to quantify ATEN's lost sales. In this case, the market at issue is the OEM market for KVM switches in the U.S. **I have not been able to identify market share data that would allow me to estimate the portion of sales that ATEN would have made**.

(Dkt. 297-2 at 17)(emphasis added).

To address the lack of actual market share data, Snell uses an "alternative method" to estimate the portion of accused sales that ATEN would have allegedly made. With the help of the Head of ATEN's OEM department, C.H. Chen, he "mapped" ATEN products to corresponding accused Uniclass products. (*Id.* at 21.) In Snell's expert report, he states, "[f]or accused products that were mapped to ATEN products, I assumed that ATEN likely would have made these sales based on my understanding from Mr. Chen, who indicated that ATEN and Uniclass have been the dominant suppliers in [the KVM switch OEM market in the United States]." (*Id.*) In essence, Snell equates his nomenclature of "dominant suppliers" with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | April 24, 2017 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

a "two-supplier" market without independent support and makes an assumption that ATEN's actual products are sufficiently similar to Unclass's products that they may be swapped in the marketplace.

"To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp.*, 185 F.3d at 1350. Here, ATEN's approach does not embody the use of sound economic principles because it does not properly account for the other competitors in the "but for" market.

There are multiple layers of guesswork in Snell's analysis. For example, Snell "started with the observation from his discussions with Chen that ATEN and Uniclass were the dominant suppliers in the KVM switch OEM market in the United States." (Dkt. 327 at 2.) He then assumes that ATEN would likely have made these sales. But he conducts no independent analysis in this regard and does not quantify what "dominant suppliers" means. As observed by Defendants, "dominant" could mean that ATEN and Uniclass represent 50% of the market and all the other competitors represent the other 50%. Snell makes no effort to account for other competitors, but claims ATEN would have made all of Uniclass's accused sales for the six identified products.

ATEN's mapping theory suffers from the same flaws as its two-supplier market theory. Again, the support for how the ATEN products are "mapped" to the accused products comes from Snell's discussion with an executive at ATEN. (Dkt. 327 at 1.) Because Snell does not have any independent qualifications to make a comparison of KVM switches, the inference is that he relied solely on ATEN to decide which of ATEN's products are sufficiently similar to Uniclass products to essentially swap them out in the market.

"Mapping" is not the answer because it assumes that no other OEMs have similar products. By only "mapping" Uniclass products to ATEN products, Snell omits a critical analytical step. To be complete, ATEN and Snell would need to map other competitor products in the KVM switch OEM market in the United States that also correspond to the Uniclass and ATEN products. Snell's mapping methodology does not overcome the existence of other competitors in the KVM OEM market.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 15-04424-AG (AJWx) | Date | April 24, 2017 |
| Title | ATEN INTERNATIONAL CO. v. UNICLASS TECHNOLOGY ET AL. | | |

Also, to claim lost profits from the customer defendants (Airlink, Broadtech, and Black Box), ATEN needed to analyze other competitor products in the overall KVM switch market in the United States (not just the OEM market). An accounting needs to be made for these gaps in "but for" causation.

ATEN has not met its burden to provide a basis for concluding that any sales of Defendants would be sales of ATEN in the "but for" market. Although the traditional market-share analysis is not required in every case, ATEN does not provide any other clear path to lost profits. In sum, Snell testifies to no factual basis for concluding that ATEN would have made Uniclass's sales in a multi-competitor market where he admits there is a dearth of factual data. Accordingly, ATEN cannot meet the reasonable probability standard for establishing lost profits.

### 3.2 Non-infringing Alternatives under the Second Panduit Factor

Having determined that Defendants are entitled to summary judgment on the basis of their first argument, the Court need not reach the second argument.

## 4. DISPOSITION

Defendants' Motion for Summary Judgment on ATEN's Lost Profits Damages is **GRANTED**.

: 0

Initials of Preparer lmb

US008589141B2

# (12) United States Patent
Lien et al.

(10) Patent No.: US 8,589,141 B2
(45) Date of Patent: Nov. 19, 2013

(54) RESOURCE SHARING APPARATUS WHICH DISCONNECTS AN INPUT DEVICE WHEN DETECTING A STANDBY INDICATION OF A SWITCHING COMMAND

(75) Inventors: **Fong Lien**, Taipei (TW); **Yao-Lung Kuo**, Taipei (TW)

(73) Assignee: **Aten International Co., Ltd.**, Shijr (TW)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 940 days.

(21) Appl. No.: **11/781,993**

(22) Filed: **Jul. 24, 2007**

(65) **Prior Publication Data**

US 2009/0031049 A1 Jan. 29, 2009

(51) **Int. Cl.**
***G06F 9/455*** (2006.01)

(52) **U.S. Cl.**
USPC .......... **703/23**

(58) **Field of Classification Search**
USPC .......... 703/23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,961,624 | A * | 10/1999 | Takayama | 710/314 |
| 6,636,929 | B1 * | 10/2003 | Frantz et al. | 710/313 |
| 6,915,367 | B2 * | 7/2005 | Gary et al. | 710/244 |
| 6,957,287 | B2 * | 10/2005 | Lou et al. | 710/72 |
| 7,340,556 | B2 * | 3/2008 | Lou et al. | 710/316 |
| 2004/0186943 | A1 * | 9/2004 | Lou et al. | 710/313 |
| 2005/0216620 | A1 * | 9/2005 | Sandulescu et al. | 710/62 |
| 2005/0273312 | A1 * | 12/2005 | Sandulescu et al. | 703/25 |
| 2006/0123182 | A1 * | 6/2006 | Sandulescu et al. | 710/316 |

OTHER PUBLICATIONS

Anonymous. "Hot Key Assignments"[online] Jun. 19, 2006. [Retrieved on Sep. 31, 2009] Retrieved from the internet: <URL: http://forums.linksysbycisco.com/linksys/board/message?board.id=KVM_Switches&message.id=5>.*

Office Action issued by the China State Intellectual Property Office in counterpart application, CN 2008100988472, dated Nov. 13, 2009.

* cited by examiner

*Primary Examiner* — Hugh Jones
(74) *Attorney, Agent, or Firm* — Chen Yoshimura LLP

(57) **ABSTRACT**

A method for controlling a resource sharing apparatus coupling least one input device to a first host is disclosed. A first input signal is acquired from the input device, and whether the first input signal comprises standby indication of a switching command is determined. The input device is disconnected from the first host when the first input signal comprises the standby indication, and the input device is emulated to the first host.

**27 Claims, 5 Drawing Sheets**




KB
Keyboard
10
Monitoring Unit
M0
MUX
20
Control Unit
100
H1
Host
H2
Host

FIG. 1


50
Input Device
240
230
Monitoring Unit
M1
MUX
210
Control Unit
220A
Emulator
220B
Emulator
M2
MUX
M3
MUX
200
H1
Host
H2
Host

FIG. 2


50
Input Device
240
230
Monitoring Unit
M1
MUX
210
Control Unit
220A
Emulator
220B
Emulator
M4
MUX
200
H1
Host
H2
Host

FIG. 3


50
Input Device
240
230
Monitoring Unit
M1
Reg 5
MUX
Bus
Emulator
220A
Emulator
220B
Control Unit
210
Reg 1
SW1
SW2
Reg 2
Reg 3
SW3
SW4
Reg 4
P4
P3
P2
P1
12
Hub
P4
P3
P2
P1
14
Hub
400
H1
Host
H2
Host

FIG. 4


S100
Initialization
S110
First input signal comprises information indicating that one of the hosts is to be switched (selected) to receive data input from the input device?
No
Yes
S120
Disconnecting the input device from the host and emulating the input device to the host H1.
S135
Connecting the input device to the host H1 again
S130
Second input signal comprises an identifier identifying one of the hosts?
Yes
S140
Connecting the input device to the identified host.

FIG. 5

# RESOURCE SHARING APPARATUS WHICH DISCONNECTS AN INPUT DEVICE WHEN DETECTING A STANDBY INDICATION OF A SWITCHING COMMAND

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to resource sharing, and in particular to a resource sharing apparatus capable of preventing transfer of unnecessary signals during switching.

2. Description of the Related Art

With rapid developments in information technology, computers becoming more prevalent in both homes and offices are often considered requisite "tools" for work, learning, leisure activities, and daily life. Sometimes a user may have more than one computer to process different tasks, often requiring access to multiple computers simultaneously. For example, a user may have one computer dedicated to work, and a second computer limited to non-work activities, such as browsing the Internet and playing video games. Traditionally, each computer is equipped with one set of input/output (IO) peripheral devices comprising, generally, a keyboard, mouse and monitor. However, this is a waste of money and space if one has several computers.

In order to solve such problems, keyboard/mouse/video (KVM) switches allow the same set of IO peripheral devices to interact with selected computers.

## BRIEF SUMMARY OF THE INVENTION

A detailed description is given in the following embodiments with reference to the accompanying drawings.

Embodiments of a method for controlling a resource sharing apparatus coupling at least one input device to a first host, in which a first input signal is acquired from the input device, and whether the first input signal includes a standby indication of a switch command is determined. The input device is disconnected from the first host when the first input signal includes the standby indication, and the input device is emulated to the first host.

The invention also provides a resource sharing apparatus capable of selectively coupling an input device to one of a first host and a second host, in which an emulator emulates the input device, and a monitor acquires a first input signal from the input device and outputs a first signal when the first input signal comprises a standby indication of a switch command. A control unit disconnects the input device from the first host and employs the emulator to reply the first host when receiving the first signal.

The invention provides another embodiment of a resource sharing apparatus capable of selectively coupling an input device to one of a first host and a second host, in which first and second emulators emulate the input device, and first and second multiplexers are coupled between the first emulator and the first host and between the second emulator and the second host respectively, and a multiplexer is coupled between the input device and the first and second multiplexers. A monitor acquires first and second input signals from the input device, outputs a first signal when the first signal comprises a standby indication of a switch command, and then outputs a second signal when the second input signal comprises an identifier identifying one of the first and the second hosts. A control unit disconnects the input device from the first host and employs the first emulator to respond to the first host when receiving the first signal, and then establishes a connection between the identified host and the input device when receiving the second signal.



## BRIEF DESCRIPTION OF THE DRAWINGS

The invention can be more fully understood by reading the subsequent detailed description and examples with references made to the accompanying drawings, wherein:

FIG. **1** schematically shows an embodiment of a resource sharing apparatus for sharing a keyboard with several hosts;

FIG. **2** shows another embodiment of a resource sharing apparatus;

FIG. **3** shows another embodiment of a resource sharing apparatus;

FIG. **4** shows another embodiment of a resource sharing apparatus; and

FIG. **5** is a flowchart of a method for controlling a resource sharing apparatus.

## DETAILED DESCRIPTION OF THE INVENTION

The following description is the best-contemplated mode of carrying out the invention. This description is made for the purpose of illustrating the general principles of the invention and should not be taken in a limiting sense. The scope of the invention is best determined by reference to the appended claims.

FIG. **1** schematically shows an embodiment of a resource sharing apparatus for sharing a keyboard with several hosts. This is not prior art for the purposes for determining the patentability of the invention and is merely shows a problem found by the inventors.

As shown in FIG. **1**, resource sharing apparatus **100** is coupled between a keyboard KB and hosts H**1** and H**2**. The keyboard KB is switched to be connected to and interact with the host H**1** or H**2** according to a switching command from the keyboard KB. For example, the switching command can be a series of keystrokes, such as Ctrl+Ctrl+1 or Ctrl+Ctrl+2. Assuming that at first the host H**1** is coupled to the keyboard KB through the multiplexer M**0**, when a series of keystrokes of Ctrl+Ctrl is detected by a monitoring unit **10**, the monitoring unit **10** enters a standby mode to wait for a number identifying host H**1** or H**2** is to be switched to inactive with the keyboard KB. Because the host H**1** is still coupled to the keyboard KB when the keyboard KB inputs the number 1 or 2 to the resource sharing apparatus **100**, the number 1 or 2, i.e., the rest of the switching command for the resource sharing apparatus **100**, may serve as input data and be transferred to the host H**1** and/or a malfunction operation may be executed, and vice versa.

FIG. **2** shows another embodiment of a resource sharing apparatus. As shown, the resource sharing apparatus **200** couples hosts H**1** and H**2** to an input device **50**. The resource sharing apparatus **200** can be implemented as a keyboard-video-mouse (KVM) switch used to allow the same set of IO peripheral devices to interact with a selected one of several hosts. The input device **50**, for example, can comprise a keyboard, a keypad, a mouse, a stylus, a touch panel and the like. The hosts H**1** and H**2**, for example, can be desk-top computers, servers or portable computers such as notebooks, tablet PCs, palmtops or UMPC, but are not limited thereto.

The resource sharing apparatus **200** comprises a control unit **210**, emulators **220**A and **220**B, a monitoring unit **230**, and multiplexers M**1**~M**3**. The control unit **210** is coupled to the emulators **220**A and **220**B, the monitoring unit **230**, and the multiplexers M**1**~M**3** to control operations thereof. The control unit **210**, for example, can be a microprocessor or a

central processing unit (CPU), but is not limited thereto. The control unit controls operations of the multiplexers M1~M3, and the emulators 220A and 220B.

The resource sharing apparatus 200 is selectively couples the input device 50 to the host H1 and the host H2 according to a switching command from the input device 50. In this embodiment, the switching command is divided into a standby indication indicating that connection between the input device 50 and the host H1/H2 maybe changed (i.e., a host will be selected to receive data input from input device 50) and an identifier identifying one of the first and the second hosts. For example, the standby indication can be generated by a series of keystrokes, such as Ctrl+Ctrl, and the second input signal with the identifier can be generated by a numeral key, such as number 1, number 2 and the like, but is not limited thereto.

The multiplexers M1~M3 are controlled by the control unit 210 to couple the input device 50 or the emulator 220A/220B to the host H1/H2 selectively. For example, the multiplexer M1 between the input device 50 and the multiplexers M2 and M3, can selectively couple the input device 50 to the multiplexers M2 and M3. The multiplexer M2 is coupled between the multiplexer M1, the emulator 220A and the host H1, selectively coupling the input device 50 or the emulator 220A to the host H1. The multiplexer M3 is coupled between the multiplexer M1, the emulator 220B and the host H2, selectively coupling the input device 50 or the emulator 220B to the host H2.

The emulators 220A and 220B are coupled to the multiplexer M2 and M3 respectively and emulate the input device 50 thereby serving as pseudo input devices to response to the host H1 or H2 when needed. After the input device 50 is disconnected from the host H1/H2, and the emulator 220A/200B is coupled to the host H1/H2 through multiplexer M2/M3, the emulator 220A/200B generates a responding signal to respond to the host H1/H2 when the host H1/H2 generates a signal polling the input device 50. For example, the host H1/H2 outputs a polling command, such as IN command, to poll the non-connected input device 50, and the emulator 220A/200B responds to the host H1/H2 by generating a signal, such as negative acknowledge, non-acknowledge or no acknowledge (NAK), to reply the host H1/H2. Thus, the host H1/H2 retries polling the input device 50, and the input device 50 is regarded as available by the host H1/H2. In some examples, the emulators 220A and 220B can be controllers capable of responding to the host H1 or H2. In some embodiments, the emulators can be universal serial bus (USB) device controllers, but are not limited thereto.

The monitoring unit 230 is coupled between the input device 50 and the control unit 210, acquires signals from the host H1/H2 and the input device 50, decodes the acquired signals and outputs corresponding signals (interrupts) to the control unit 210, such that the control unit 210 executes some predetermined resource sharing operations accordingly. For example, when an input signal comprises the standby indication of the switching command, the monitoring unit 230 outputs a first signal to the control unit 210. When receiving the first signal, the control unit 210 enables the multiplexer M2/M3 to disconnect the host H1/H2 from the input device 50, and further establishes a connection between the host H1/H2 and the emulator 220A/220B and to enter a standby mode. When a second input signal comprises an identifier identifying one of the first and the second hosts, the monitoring unit 230 outputs a second signal to the control unit 210 accordingly, such that the control unit 210 establishes a connection between the selected host and the input device 50.



For example, the input device 50 can be coupled to the host H1 through the multiplexer M1 and the multiplexer M2 initially, and the monitoring unit 230 outputs the first signal to the control unit 210 such that the multiplexer M2 disconnects the host H1 from the input device 50 and establishes a connection between the host H1 and the emulator 220A when an input signal comprises the standby indication. As the monitoring unit 230 then receives a second input signal comprises an identifier (for example number 2) identifying the host H2, the monitoring unit 230 outputs a second signal to the control unit 210 such that the control unit 210 controls the multiplexers M1 and M3 to establish a connection between the identified host (i.e. the host H2) and the input device 50. In addition, the control unit 210 controls the multiplexer M2 to disconnect the emulator 220A from the host H1, such that the input device 50 is regarded as unavailable by the host H1.

On the contrary, as the identifier (example number 1) identifies the host H1, the monitoring unit 230 outputs the second signal to the control unit 210 such that the control unit 210 controls the multiplexer M2 to recovery the connection between the identified host (i.e. the host H1) and the input device 50. Namely, the control unit 210 controls the multiplexer M2 to disconnect the emulator 220A from the host H1 and establish the connection between the host H1 and the input device 50 anew. In this embodiment, the input device 50 can be a keyboard, the input signal can be generated by a series of keystrokes, such as Ctrl+Ctrl, the second input signal with the identifier can be generated by a numeral key, such as number 1, number 2 and the like, but is not limited thereto.

Because the input device 50 is disconnected from the host H1 and is not connected to the host H2 yet, the second input signal comprises identification that one of the first and the second hosts, i.e., a part of the switching command for the resource sharing apparatus 200, may not be transferred to the hosts H1 and H2. Therefore, malfunction operations can be prevented. In some embodiments, the multiplexers M1~M3 can be implemented by registers and switches controlled by the control unit 210 to connect or disconnect the input device 50 or the emulators 220A and 220B to the hosts H1 and H2. In some embodiments, the switches can be implemented by transistors controlled by the control unit 210 to connect or disconnect the input device 50 or the emulators 220A and 220B to the hosts H1 and H2.

FIG. 3 shows another embodiment of a resource sharing apparatus. As shown, the resource sharing apparatus 300 is similar to the resource sharing apparatus 200 shown in FIG. 2, differing only in that a multiplexer M4 is coupled between the hosts H1 and H2, the emulators 220A and 220B and the input device 50 to control connections thereof rather than two multiplexers M2 and M3.

FIG. 4 shows another embodiment of a resource sharing apparatus. As shown, the resource sharing apparatus 400 is similar to the resource sharing apparatus 200 shown in FIG. 2, differing only in that the multiplexers M2 and M3 are implemented by switches SW1~SW4 and registers Reg1~Reg4, two hubs 12 and 14 coupled between the hosts H1 and H2 and switches SW1~SW4, and the control unit 210 is coupled to the emulators 220A and 220B, the monitoring unit 230 through the bus 240. In this embodiment, the hubs 12 and 14 are compatible with universal serial bus (USB) specification, the emulators 220A and 220B can be controllers capable of responding to the host H1 or H2. In some embodiments, the emulators can be universal serial bus (USB) device controllers, the input device 50 can be regarded as a keyboard but is not limited thereto.

In initially, the downstream ports P1 of the hubs 12 and 14 are coupled to the hosts H1 and H2 respectively and the hosts

H1 and H2 enumerate the hubs 12 and 14 respectively, and the emulators 220A and 220B are not connected to the downstream ports P1 of the hubs 12 and 14 respectively.

The control unit 210 then sets the registers Reg5 and Reg1, such that the input device 50 is connected to the switch SW1 through the multiplexer M1 and the switch SW1 is turned on. Hence, the input device 50 is connected to the downstream port P1 of the hub 12, and the host H1 enumerates the input device 50. During enumeration of the input device 50, the monitoring unit 230 acquires and decodes commands at the downstream port P1 of the hub 12 and to obtain data comprising a communication address and endpoint, in which the data is provided to the input device 50 by the host H1. The monitoring unit 230 then generates a first interrupt to the control unit 210, and the control unit 210 configures the emulator 220A with the data (the communication address and endpoint) to the emulator 220A when receiving the first interrupt from the monitoring unit 230. Namely, in the embodiment, the emulator 220A is configured with the data comprising a communication address and endpoint, in which the data is provided to the input device 50 by the host H1. After this, the emulator 220A can be regarded as a pseudo input device capable of responding to the host H1.

When the input device 50 inputs an input signal comprising a standby indication, the monitoring unit 230 outputs a second interrupt serving as the first signal to the control unit 210 and enters a standby mode. For example, the standby indication can be generated by a series of keystrokes, such as Ctrl+Ctrl. In this mode, the control unit 210 sets the registers Reg1 and Reg2 such that the switch SW1 is turned off and the switch SW2 is turned on. Hence, the downstream port P1 of the hub 12 is disconnected from the input device 50 and connected to the emulator 220A. The emulator 220A generates a signal, such as negative acknowledge, non-acknowledge or no acknowledge (NAK), to reply the host H1 when the host H1 outputs a polling command, such as IN command, to poll the non-connected input device 50. Hence, the input device 50 is regarded as available by the host H1 and the host H1 retries polling the input device 50.

When the input device 50 then inputs a second input signal comprising an identifier (for example number 1) identifying the host H1, the monitoring unit 230 outputs a third interrupt to serve as the second signal for the control unit 210. When receiving the third interrupt, the control unit 210 sets the registers Reg1 and Reg2 such that the switch SW1 is turned on and the switch SW2 is turned off. For example, the input signal with the identifier can be generated by a numeral key, such as number 1, number 2 and the like, but is not limited thereto. Hence, the downstream port P1 of the hub 12 is disconnected from the emulator 220A and connected to the input device 50 again.

On the contrary, as the identifier is number 2 identifying the host H2, the monitoring unit 230 outputs a fourth interrupt to serve as the second signal to the control unit 210. When receiving the fourth interrupt, the control unit 210 sets the registers Reg3 and Reg5, such that the switch SW3 is turned on, and enables the multiplexer M1 to connect the input device 50 to the switch SW3, such that the input device 50 is connected to the downstream port P1 of the hub 14. At the same time, the control unit 210 sets the registers Reg2 to turn off the switch SW2, such that the emulator 220A is disconnected from the hub 12, and the host H1 presumes that there is no available input device.

After the input device 50 is connected to the downstream port P1 of the hub 14, the host H2 enumerates the input device 50. During enumeration of the input device 50, the monitoring unit 230 acquires and decodes commands at the downstream port P2 of the hub 14, and obtains data comprising a communication address and endpoint, in which the data is provided to the input device 50 from the host H2. The monitoring unit 230 then generates a fifth interrupt to the control unit 210, and the control unit 210 configures the emulator 220B with the data (the communication address and endpoint) when receiving the fifth interrupt from the monitoring unit 230. Namely, in the embodiment, the emulator 220B is configured with the data (the communication address and endpoint) which is provided to the input device 50 from the host H2. After this, the emulator 220B can be regarded as a pseudo input device capable of responding to the host H2.

Because the input device 50 is disconnected from the hosts H1 and H2, the second input signal comprising the identifier identifying one of the hosts H1 and H2 are not transferred to the hosts H1 and H2 when the second input signal is inputted to the resource sharing apparatus 200. Namely, the part of the switching command for the resource sharing apparatus 200, i.e., an unnecessary signal for the hosts H1 and H2, may not transferred to the hosts H1 and H2. Thus, malfunction operations can be prevented.

FIG. 5 shows a method for controlling a resource sharing apparatus. The resource sharing apparatus, for example, can be implemented as a keyboard video mouse (KVM) switch used to allow the same set of input devices and output devices to interact with a selected one of several hosts. The input device, for example, can be compatible with universal serial bus (USB) specification and the emulators 220A and 220B can be controllers capable of responding to the host H1 or H2. In some example, the emulators can be universal serial bus (USB) device controllers, and the input device 50 can be regarded as a keyboard, a keypad, a mouse, a stylus, a touch panel, but is not limited thereto. The hosts, for example, can be desk-top computers, servers or portable computers such as notebooks, tablet PCs, palmtops or UMPC, but are not limited thereto. Detail operations in the method are described hereinafter with reference to FIG. 4 and FIG. 5.

In step S100, an initialization is executed to couple the input device 50 to one of the hosts H1 and H2, and disconnect the emulators 220A and 220B from the hubs 12 and 14. For example, the control unit 210 can couple the input device 50 to the host H1 by multiplexers or switches.

As shown in an example of FIG. 4, upstream ports of the hubs 12 and 14 are coupled to the hosts H1 and H2 respectively and the hosts H1 and H2 enumerate the hubs 12 and 14 respectively, and the emulators 220A and 220B are not connected to the downstream ports P1 of the hubs 12 and 14 respectively. The control unit 210 then sets the registers Reg5 and Reg1, such that the input device 50 is connected to the switch SW1 through the multiplexer M1 and the switch SW1 is turned on. Hence, the downstream port P1 of the hub 12 is connected to the input device 50, the host H1 enumerates the input device 50, and thus, the host H1 can communicate with the input device 50, i.e. interact with the input device 50. At this time, there is no input device connected to the hub 14.

During enumeration of the input device 50, the monitoring unit 230 acquires and decodes commands at the downstream port P1 of the hub 12, and obtains data comprising a communication address and endpoint, in which the data is provided to the input device 50 by the host H1. The monitoring unit 230 then generates a first interrupt to the control unit 210, and the control unit 210 configures the emulator 220A with the data (the communication address and endpoint) to the emulator 220A when receiving the first interrupt from the monitoring unit 230. Namely, the emulator 220A can be regarded as a pseudo input device capable of responding to the host H1 at this time.

In step S110, whether a first (present) input signal comprises information indicating that one of the hosts H1 and H2 is to be switched (selected) to receive data input from the input device is determined. For example, such information can be regarded as a standby indication of a switching command indicating that connection between the input device 50 and the host H1/H2 may be changed (i.e., a host will be selected to receive data input from input device 50). The switching command further comprises an identifier identifying one of the first and the second hosts. If the first input signal comprises such standby indication, the nest step S120 is executed. For example, the monitoring unit 230 is coupled to the input device 50 to acquire and decode the first input signal from the input device 50 thereby determining whether the first input signal is used to control the resource sharing apparatus 400 (i.e. the standby indication) rather than to control the host H1 or the host H2. In some embodiments, the standby indication can be generated by a series of keystrokes, such as Ctrl+Ctrl. If the first input signal does not comprise such standby indication, which means that the first input signal is used to control the host H1 or the host H2, the monitoring unit 230 repeats the step S110 to detect the next input signal.

In step S120, the input device 50 is disconnected from the host H1 and the emulator 220A is configured to emulate the input device 50 to the host H1, when the first input signal comprises such standby indication. The monitoring unit 230, for example, outputs a second interrupt serving as the first signal to the control unit 210 and enters a standby mode when the acquired input signal comprises standby indication. As shown in FIG. 4, when receiving the second interrupt (i.e., the first signal) from the monitoring unit 230, the control unit 210 sets the registers Reg1 and Reg2 such that the switches SW1 and SW2 are turned off and on respectively in this mode. Hence, the downstream port P1 of the hub 12 is disconnected from the input device 50 and connected to the emulator 220A.

After being connected to the host H1, the emulator 220A generates a response signal to reply the host H1 when the host H1 outputs a polling command, such as IN command, to poll the emulator 220A, because the emulator 220A is a pseudo input device. For example, the response signal for replying the host H1 can be a negative acknowledge signal, non-acknowledge signal or a no-acknowledge (NAK) signal. Namely, the control unit 210 controls the emulator 220A to emulate the input device 50 to the host H1 when the first input signal comprises such standby indication, and thus, the input device 50 is regarded as available by the host H1 even though the input device 50 is disconnected to host H1.

In step S130, whether a second (subsequent) input signal comprises an identifier identifying one of the hosts H1 and H2 is determined. If the second input signal comprises such identifier, the next step S140 is executed. For example, the monitoring unit 230 acquires and decodes the second input signal from the input device 50 to determine whether the second input signal comprises such identifier. The information with the identifier can be generated by a numeral key, such as number 1, number 2 or the like, but is not limited thereto. For example, the number 1 represents the host H1, the number 2 represents the host H2, and so on, but is not limited thereto. If the second input signal does not comprise such identifier, step S135 is then executed, i.e., the monitoring unit 230 triggers the control unit 210 to turn on the switch SW1 and turn off the switch SW2, such that the emulator 220A is disconnected from the hub 12 and the input device 50 is coupled to the host H1 through the hub 12 again.

In step S140, the input device is connected to the identified host. For example, when the identifier, such as number 1, in the second input signal identifies the host H1, the monitoring unit 230 outputs a third interrupt to serve as the second signal for the control unit 210. When receiving the third interrupt, the control unit 210 sets the registers Reg1 and Reg2 such that the switch SW1 is turned on and the switch SW2 is turned off. Hence, the downstream port P1 of the hub 12 is disconnected from the emulator 220A and connected to the input device 50 again.



On the contrary, as the identifier is number 2 identifying the host H2, the monitoring unit 230 outputs a fourth interrupt to serve as the second signal for the control unit 210. When receiving the fourth interrupt, the control unit 210 sets the registers Reg3 and Reg5, such that the switch SW3 is turned on, and the multiplexer M1 connects the input device 50 to the switch SW3. Hence, the input device 50 is connected to the downstream port P1 of the hub 14. At this time, the control unit 210 further sets the registers Reg2 to turn off the switch SW2, such that the emulator 220A is disconnected from the hub 12, and the host H1 presumes that there is no available input device. For example, the second input signal with the identifier can be generated by a numeral key, but is not limited thereto.

After the input device 50 is connected to the downstream port P1 of the hub 14, and the host H2 enumerates the input device 50. During enumeration of the input device 50, the monitoring unit 230 acquires and decodes commands at the downstream port P2 of the hub 14, and obtains data comprising a communication address and endpoint, in which the data is provided to the input device 50 by the host H2. The monitoring unit 230 then generates a fifth interrupt to the control unit 210, such that the control unit 210 configures the emulator 220B with the data (the communication address and endpoint) to the emulator 220B when receiving the interrupt from the monitoring unit 230. Namely, the emulator 220B can be regarded as a pseudo input device capable of responding to the host H2.

Because the input device 50 has been disconnected from the hosts H1 and H2 after the resource sharing apparatus 200 receives the standby indication, the second input signal comprising the identifier identifying one of the hosts H1 and H2 is not transferred to the hosts H1 and H2 when the second input signal is inputted to the resource sharing apparatus 200. Namely, the part of the switching command for the resource sharing apparatus 200, i.e., an unnecessary signal for the hosts H1 and H2, may not be transferred to the hosts H1 and H2. Therefore, malfunction operations can be prevented.

While the invention has been described by way of example and in terms of preferred embodiment, it is to be understood that the invention is not limited thereto. To the contrary, it is intended to cover various modifications and similar arrangements (as would be apparent to those skilled in the art). Therefore, the scope of the appended claims should be accorded the broadest interpretation so as to encompass all such modifications and similar arrangements.

What is claimed is:

1. A method for controlling a resource sharing apparatus coupling at least one input device to a plurality of hosts including a first host, the method comprising:

connecting the input device to the first host;

while the input device is connected to the first host, acquiring a first input signal from the input device and determining whether the first input signal comprises a standby indication of a switch command and wherein the standby indication is for indicating that connection between the input device and the first host can be changed; and

in response to a determination that the first input signal comprises the standby indication, disconnecting the

input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host; and

acquiring a second input signal from the input device, wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus.

2. The method as claimed in claim 1, wherein the input device is emulated to the first host by an emulator.

3. The method as claimed in claim 2, wherein the emulator is a universal serial bus (USB) device controller.

4. The method as claimed in claim 1, wherein emulation of the input device to the first host comprises:

establishing a connection between the input device and an emulator; and

outputting a responding signal indicating the presence of the input device to the first host when the first host polls the input device.

5. The method as claimed in claim 1, further comprising:

after acquiring the first input signal, acquiring the second input signal from the input device, the second input signal being immediately subsequent to the first input signal;

determining whether the second input signal comprising an identifier identifying one of the plurality of hosts; and

establishing a connection between the identified host and the input device.

6. The method as claimed in claim 1, wherein the first input signal is generated by a series of keystrokes of a keyboard.

7. The method as claimed in claim 1, wherein the second input signal is generated by a numeral key of the keyboard.

8. The method as claimed in claim 1, further comprising:

acquiring first data comprising a communication address provided to the input device by the first host during an enumeration step; and

storing the first data to the emulator.

9. A resource sharing apparatus suitable for selectively coupling an input device to one of a plurality of hosts including a first host, comprising:

an emulator for emulating the input device;

a monitor for acquiring a first input signal from the input device and outputting a first signal when the first input signal comprises a standby indication of a switch command and wherein the standby indication is for indicating that connection between the input device and the first host can be changed;

a control unit for (1) connecting the input device to the first host, and (2) in response to receiving the first signal while the input device is connected to the first host, disconnecting the input device from the first host without connecting the input device to any other host and connecting the emulator to the first host; and

acquiring a second input signal from the input device, wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus.

10. The resource sharing apparatus as claimed in claim 9, wherein the emulator is a universal serial bus (USB) device controller.

11. The resource sharing apparatus as claimed in claim 9, further comprising a first multiplexer controlled by the control unit to selectively couple the input device or the emulator to the first host.

12. The resource sharing apparatus as claimed in claim 9, wherein the monitor further acquires the second input signal from the input device, the second input signal being immediately subsequent to the first input signal, and outputs a second signal when the second input signal comprises an identifier identifying one of the plurality of hosts, and the control unit further establishes a connection between the identified host and the input device when receiving the second signal.



13. The resource sharing apparatus as claimed in claim 9, wherein the monitor acquires first data comprising the communication address provided to the input device by the first host and asserts an interrupt, such that the control unit configures the emulator with the first data.

14. The resource sharing apparatus as claimed in claim 9, wherein the emulator outputs a responding signal indicating the presence of the input device to the first host when the first host polls the input device.

15. The resource sharing apparatus as claimed in claim 9, wherein the input device comprises a keyboard or a mouse.

16. The resource sharing apparatus as claimed in claim 11, further comprising a hub coupled between the first host and the first multiplexer.

17. The resource sharing apparatus as claimed in claim 16, wherein the hub is compatible with universal serial bus (USB) specification.

18. A resource sharing apparatus suitable for selectively coupling an input device to one of a plurality of hosts including a first host and a second host, comprising:

a first emulator for emulating the input device;

a second emulator for emulating the input device;

a first multiplexer coupled between the first emulator and the first host;

a second multiplexer coupled between the second emulator and the second host;

a third multiplexer coupled between the input device, the first multiplexer and the second multiplexer;

a monitor for acquiring a first input signal and a second input signal from the input device, outputting a first output signal when the first input signal comprises a standby indication of a switch command and wherein the standby indication is for indicating that connection between the input device and the first host can be changed, and outputting a second output signal when the second input signal is immediately subsequent to the first input signal and comprises an identifier identifying one of the first and the second hosts;

a control unit for (1) connecting the input device to the first host, and (2) in response to receiving the first output signal while the input device is connected to the first host, disconnecting the input device from the first host without connecting the input device to any other host and connecting the first emulator to the first host, and for establishing a connection between the identified host and the input device when receiving the second signal; and

wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus.

19. The resource sharing apparatus as claimed in claim 18, wherein the first host provides a communication address to the input device, the monitor acquires first data comprising the communication address and asserts an interrupt to the control unit, and the control unit configures the emulator with the first data when receiving the interrupt.

20. The resource sharing apparatus as claimed in claim 18, wherein the control unit enables the first multiplexer to couple the first emulator to the first host, and disconnect the first host and the third multiplexer, when receiving the first signal.

21. The resource sharing apparatus as claimed in claim 20, wherein the first emulator outputs a responding signal indi-

cating the presence of the input device to the first host when the first host polls the input device.

**22**. The resource sharing apparatus as claimed in claim **21**, wherein the control unit enables the third multiplexer to couple the input device to the second host through second multiplexer according to the second signal when the second input signal comprises an identifier identifying the second host.

**23**. The resource sharing apparatus as claimed in claim **18**, further comprising a first hub and second hub, wherein the first hub is coupled between the first host and the first multiplexer, and the second hub is coupled between the second host and the host multiplexer.

**24**. The resource sharing apparatus as claimed in claim **18**, wherein the resource sharing apparatus is a keyboard-video-mouse (KVM) switch.

**25**. The resource sharing apparatus as claimed in claim **18**, wherein the input device comprises a mouse or a keyboard.

**26**. A method for controlling a resource sharing apparatus coupling at least one input device to a plurality of hosts including a first host, the method comprising:

connecting the input device to the first host;

while the input device is connected to the first host, acquiring a first input signal from the input device and determining whether the first input signal comprises a standby indication of a switch command;

in response to a determination that the first input signal comprises the standby indication, disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host; and

after acquiring the first input signal, acquiring a second input signal from the input device;

wherein the first input signal is generated by a series of keystrokes of a keyboard, the second input signal is generated by a numeral key of the keyboard, and the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus.

**27**. A method for controlling a resource sharing apparatus coupling at least one input device to a plurality of hosts including a first host, the method comprising:

connecting the input device to the first host;

while the input device is connected to the first host, acquiring a first input signal from the input device and determining whether the first input signal comprises a standby indication of a switch command;

in response to a determination that the first input signal comprises the standby indication, disconnecting the input device from the first host without connecting the input device to any other host and starting emulating the input device to the first host; and

after acquiring the first input signal, acquiring a second input signal from the input device;

wherein the second input signal is not transferred to the hosts when it is inputted to the resource sharing apparatus.

* * * * *

US007640289B2

(12) **United States Patent**
**Chen**

(10) **Patent No.: US 7,640,289 B2**
(45) **Date of Patent: *Dec. 29, 2009**

(54) **INTELLIGENT COMPUTER SWITCH**

(75) Inventor: **Sun-Chung Chen**, Taipei (TW)

(73) Assignee: **Aten International Co., Ltd.**, Shijr (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/046,606**

(22) Filed: **Mar. 12, 2008**

(65) **Prior Publication Data**

US 2008/0155048 A1 Jun. 26, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/244,532, filed on Sep. 17, 2002, now Pat. No. 7,386,584.

(30) **Foreign Application Priority Data**

Nov. 8, 2001 (TW) .............................. 90127798 A

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ...................................................... **709/200**

(58) **Field of Classification Search** ................. 709/208, 709/244, 223; 710/62, 73; 345/168; 370/400–402
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,499,377 | A | 3/1996 | Lee | |
| 5,900,824 | A | 5/1999 | Hayashi | |
| 6,388,658 | B1 | 5/2002 | Ahern et al. | |
| 6,567,869 | B2 | 5/2003 | Shirley | |
| 6,633,905 | B1 * | 10/2003 | Anderson et al. | 709/219 |
| 6,670,882 | B1 | 12/2003 | Bachar | |
| 6,671,756 | B1 | 12/2003 | Thomas et al. | |

OTHER PUBLICATIONS

IBM TDB, Detection of Connection Status for Devices in a Daisy Chain, May 6, 2001, pp. 1-2.*
Lightwave Communications, PC ServerSwitch 2x16 User Manual, Sep. 2001, Revision A.*
Belkin, The OmniView SE 2-Port User Manual, Sep. 2000, pp. 1-16.
Lightwave Communications, PC ServerSwitch 2x16 User Manual, Sep. 2001. Revision A.

* cited by examiner

*Primary Examiner*—Shawki S Ismail
*Assistant Examiner*—Grant Ford
(74) *Attorney, Agent, or Firm*—Chen Yoshimura LLP

(57) **ABSTRACT**

An intelligent computer switch is described. The intelligent computer switch has an automatic detection capacity to control a plurality of computers with at least one keyboard, at least one mouse and at least one monitor. The intelligent computer switch comprises an input port, a control device, an output port, and a plurality of computer connection ports. The input port receives input commands and data, and the output port sends output commands and data. While a series connection cable connected to the input port, the intelligent computer switch is determined to be a slave. While the series connection cable is not connected to the series connection cable, the intelligent computer switch is determined to be a master. The intelligent computer switch further comprises an on-screen display function and an authority-setting function with at least 4 sets of passwords for different users. Each slave generates a series number according to the sequence thereof and the master controls each slave according to the series number.

**20 Claims, 3 Drawing Sheets**






FIG. 1




FIG. 2


610
START
620
Input port connected a cable =?
Yes
630
Slave
640
No
Master
645
Arranging series No.
650
Yes
Series No. changed
No
670
No
660
Waiting for command from Master
Master=?
Yes
680
Communicating with Slave
690
New Slave added=?
Yes
No

FIG. 3

## INTELLIGENT COMPUTER SWITCH

This application is a continuation of U.S. application Ser. No. 10/244,532, filed Sep. 17, 2002, now allowed, which is herein incorporated by reference in its entirety.

### FIELD OF THE INVENTION

The present invention relates to an intelligent computer switch and especially to an intelligent computer switch with an auto detecting function and an auto adjusting function as a series connection sequence is changed.

### BACKGROUND OF THE INVENTION

The wide proliferation of personal computers and networks allows people to utilize the networks to search for and provide information. Currently, network requests are higher, and network-related enterprises have to buy large numbers of computers and a lot of network equipment to satisfy user requests. For example, internet service providers and virtual host providers need to buy large numbers of server computers to rent to users. Because these providers may supply a fast network environment, a lot of companies are willing to rent their servers. The management and trouble shooting of these computers may become an important link. A larger server provider has thousands of server computers. Control of each of these computers requires a monitor, a keyboard and a mouse. Actually, each of these computers spends little time on the monitor, keyboard and mouse. Most of the time, the servers need no peripheral devices for control. Control of every computer with a set of these peripheral devices would incur high operation costs and is not necessary. Such peripheral devices also waste space. In resolution of these problems, a computer switch with a monitor, a keyboard and a mouse controls a plurality of server computers.

A compact type of the computer switch can connect at least two computers and switch between these computers. The quantities of the connection port are increased to connect more computers by way of one computer switch. However, this arrangement still cannot fulfill the requests of a larger computer company. Hence, a series connection computer switch is designed for a larger computer company. More computers can be controlled by the series connection computer switches with one set of peripheral devices, a monitor, a keyboard and a mouse. The series connection computer switches reduce the quantity of the peripheral devices. Series connection computer switches set their series number with dip switches, a type of mechanical switch. Therefore, every series connection computer switch must be set with its own series number before use. If a series number is duplicated or a computer switch is not functioning, the series numbers must be checked and reset. During this process, all server computers must wait for a new computer switch to be set and installed. This wastes time and delays business.

### SUMMARY OF THE INVENTION

The series numbers of conventional computer switches are difficult to set and incorrect settings are difficult to find. There is therefor a need to have a computer switch that can automatically generated series number thereof and automatically arrange the connection sequence. In particular, if the series connection sequence is changed, the computer switches can automatically rearrange their series numbers and control by the new master computer switch.



The present invention discloses an intelligent computer switch with an automatic detection capacity to control a plurality of computers with one keyboard, one mouse and one monitor. The intelligent computer switch comprises an input port, a control device, an output port, and a plurality of computer connection ports.

The input port receives input commands and input data from other intelligent computer switches. The output port sends output commands and output data to another intelligent computer switch. The control device couples with the input port and the output port. While a series connection cable is connected to the input port, the control device sets the intelligent computer switch as a slave. While the series connection cable is not connected to the input port, the control device sets the intelligent computer switch as a master. The control device repeatedly detects a connection status of the input port. The plurality of computer connection ports couple with the control device and control the computers.

The intelligent computer switch comprises an on screen display function and an authority-setting function with at least 4 sets of passwords for different users. The master can control the slave and obtain data from the slave. Each slave generates a series number according to the quantity of intelligent computer switches before the slave and the master can control each slave according to the series number.

Another aspect of the present invention is an intelligent computer switch system to control a plurality of computers with at least one keyboard, at least one mouse and at least one monitor. The intelligent computer switch system comprises at least one series connection cable and a plurality of intelligent computer switches. The series connection cable couples an output port of one intelligent computer switch to the input port of other intelligent computer switches.

Therefore, the intelligent computer switch according to the present invention can detect and arrange the series connection sequence automatically. The master can obtain the data from the slaves immediately when the series connection sequence is changed or a new slave is added. The intelligent computer switch can control a plurality of server computers with only one set of peripheral devices. In particular, as the series connection sequence is changed, the intelligent computer switch may detect the master, determine the slave sequence, and the master can obtain information of all server computers immediately.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing aspects and many of the attendant advantages of this invention are more readily appreciated as the same becomes better understood by reference to the following detailed description, when taken in conjunction with the accompanying drawings, wherein:

FIG. **1** is a schematic diagram of one embodiment according to the present invention, intelligent computer switches, connected with peripheral devices and server computers;

FIG. **2** is a schematic diagram to describe changing the series connection sequence of the intelligent computer switches according to the present invention when the status of series connection cables is changed; and

FIG. **3** is a flow chart to describe the work process of the intelligent computer switches according to the present invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **1** is a schematic diagram of one embodiment according to the present invention, intelligent computer switches,

connected with peripheral devices and server computers. In one embodiment, three intelligent computer switches **10** connect with a monitor **40**, a keyboard **50**, a mouse **60** and a plurality of server computers **70**. Each intelligent computer switch **10** comprises an input port **11**, an output port **12**, a first connection port **13**, a second connection port **14**, a monitor connection port **15**, a keyboard connection port **16**, and a mouse connection port **17**. The monitor connection port **15** connects with the monitor **40**. The keyboard connection port **16** connects with the keyboard **50**. The mouse connection port **17** connects with the mouse **60**. The first connection port **13** and the second connection port **14** connect with the server computers **70**. The output port **12** connects with the input port **11** of another intelligent computer switch **10**. The intelligent computer switch **10** controls the server computers **70** with only one set of peripheral devices, the monitor **40**, the keyboard **50**, and the mouse **60**. Each intelligent computer switch **10** can control about 2-16 server computers and can serially connect about 31 intelligent computer switches **10**. That is to say, about 512 server computers can be controlled by one set of peripheral devices. It will be appreciated that the quantities of the controlled server computers and the serially connected intelligent computer switches are not limited to the quantities stated here.

Referring to FIG. **2**, a schematic diagram discloses that the series connection sequence of the intelligent computer switches according to the present invention is changed when the status of the series connection cables is changed. For example, three intelligent computer switches **100**, **200** and **300** according to the present invention are connected by series connection cables **400** and **500**. On the left side of the diagram, the series connection cable **400** connects an output port **104** of the intelligent computer switch **100** to an input port **202** of the intelligent computer switch **200**, and the series connection cable **500** connects an output port **204** of the intelligent computer switch **200** to an input port **302** of the intelligent computer switch **300**, simultaneously. The input port **202** obtains data and commands from the output port **104**. The input port **302** obtains data and commands from the output port **204**. The three intelligent computer switches **100**, **200** and **300** are connected together serially. Each intelligent computer switch can control about 16 server computers, and the three intelligent computer switches **100**, **200** and **300** can therefore control about 48 server computers. A set of peripheral devices **106**, a monitor, a mouse and a keyboard, is connected to the intelligent computer switch **100**. Therefore, the set of peripheral devices **106** controls the server computers connected to the three intelligent computer switches **100**, **200** and **300**. At this moment, the intelligent computer switch **100** is defined as a master, the intelligent computer switch **200** is defined as slave **1** and the intelligent computer switch **300** is defined as slave **2**.

On the right side of the diagram, the connection status of the cables **400** and **500** is changed, and therefore the series connection sequence is changed. As the right side of the diagram shows, the cable **400** is connected to the output port **304** of the intelligent computer switch **300** instead of the output port **104** of the intelligent computer switch **100**. Simultaneously, the cable **500** is connected to the input port **102** of the intelligent computer switch **100** instead of the input port **302** of the intelligent computer switch **300**. At this moment, the intelligent computer switch **300** is defined as a master; the intelligent computer switch **100** is defined as slave **2** and the intelligent computer switch **200** is defined as slave **1**. Therefore, the set of peripheral devices **306** connected to intelligent computer switch **300** controls the server computers connected to the three intelligent computer switches **100**, **200** and **300**. The intelligent computer switch detects the status of the input port and then a control device, such as a central processing unit or a programmable control unit, determines the intelligent computer switch to be a master or a slave.

The intelligent computer switch further has the function of on screen display (OSD). The OSD function can set at least names of the server computers and parameters of the intelligent computer switch more efficiently. As the data are set by the OSD function, the data are stored in a memory of the intelligent computer switch directly connected to the input computer and are transferred to the master. When the master is changed, the new master requests that slaves send their data to the new master. Therefore, the new master controls all server computers connected directly and indirectly thereto. This function saves a lot of time when the series connection sequence is changed. The network management can control all server computers immediately.

The intelligent computer switch detects status with a predetermined frequency. If the intelligent computer switches find the series connection sequence is changed, the intelligent computer switches confirm the new master. The important factor is whether or not the input port is connected to a series connection cable. If the input port is connected to a series connection cable, the intelligent computer switch is a slave. On the contrary, if the input port is not connected to a series connection cable, the intelligent computer switch is master. When the master is determined, the series numbers of the other intelligent computer switches are determined. The intelligent computer switch directly connected with the master is slave **1**. The slave of the intelligent computer switch directly connecting with slave **1** is slave **2**. Therefore, the series connection sequence is determined.

Referring to FIG. **3**, a flow chart discloses the work process of the intelligent computer switches according to the present invention. In step **610**, the intelligent computer switch is turned on. In step **620**, the intelligent computer switch detects whether or not a series connection cable is connected to the input port. If a series connection cable is connected to the input port, the process goes to step **630**, the intelligent computer switch is identified as a slave, and then the process goes to step **645**. If no series connection cable is connected to the input port, the process goes to step **640**, the intelligent computer switch is determined as a master, and then the process goes to step **645**. In step **645**, the intelligent computer switches arrange their series connection sequence. The series number is about the quantity of the intelligent computer switch before this intelligent computer switch. 00 means a master, 01 means slave **1**, 02 means slave **2**, and so on.

Because the master is 00, slave **1** obtains information from the master, and then the slave **1** determines the series number thereof to be 01. By the same rule, slave **2** obtains information from slave **1** and slave **2** adds 1 to determine the series number thereof. In step **650**, the intelligent computer switch detects whether or not the series connection sequence has changed. If the series connection sequence has changed, the process goes back to step **620**. If the series connection sequence is unchanged, the process goes to step **660**. Step **660** separates the intelligent computer in two ways: the first way is waiting for the master command for the slaves; the second way is communicating with the slaves to obtain the data in their memories for the master. In step **690**, the master continues detecting whether or not any new slave has been added. Both master and slave go back to step **620** after a predetermined period to detect whether or not the series connection sequence has changed.

Due to the previous process, the intelligent computer switches according to the present invention can automatically

detect and arrange the sequence thereof. The master can obtain the data from the slaves immediately when the series connection sequence is changed or a new slave is added. The intelligent computer switch according to the present invention can control a plurality of server computers with one set of the peripheral devices. In particular, as the series connection sequence is changed, the intelligent computer switch immediately detects the master, determines the slave sequence, and the master obtains information from all server computers. Furthermore, the intelligent computer switch according to the present invention has an OSD function to input the server computer information in the memory of the intelligent computer switch. When the intelligent computer switches are working, the master catches the data to control the server computers.

As is understood by a person skilled in the art, the foregoing preferred embodiments of the present invention are illustrative of the present invention rather than limiting of the present invention. It is intended that various modifications and similar arrangements be included within the spirit and scope of the appended claims, the scope of which should be accorded the broadest interpretation so as to encompass all such modifications and similar structures.

What is claimed is:

**1**. A computer switch comprising:

a set of peripheral device ports for connecting to a set of peripheral devices;

a first port;

a second port;

a control device coupled to the first port and the second port, the control device repeatedly detecting whether the first port is occupied to repeatedly determine a master or slave status of the computer switch, wherein

if the first port is occupied, the control device determines the computer switch to be a slave and provides data to a first external computer switch connected to the first port, and

if the first port is unoccupied, the control device determines the computer switch to be a master and controls a second external computer switch connected to the second port and obtains data from the second external computer switch; and

a plurality of computer connection ports coupled to the control device for connecting to and controlling a plurality of computers, wherein the plurality of computers are controlled by the set of peripheral devices if the computer switch is determined to be a master, and are controlled by the first external computer switch connected to the first port if the computer switch is determined to be a slave.

**2**. The computer switch of claim **1**, wherein if the control device determines the computer switch to be a slave, it configures a series number of the computer switch into a slave series number based on information regarding a series connection sequence received from the first port.

**3**. The computer switch of claim **1**, wherein if the control device determines the computer switch to be a master, it configures a series number of the computer switch into a master series number.

**4**. The computer switch of claim **2**, wherein the control device repeatedly detects the information regarding the series connection sequence from the first port and reconfigures its series number if the series connection sequence has changed.

**5**. The computer switch of claim **3**, wherein the control device repeatedly detects information received from the second port to determine whether a new slave has been added.



**6**. A computer switch comprising:

a set of peripheral device ports for connecting to a set of peripheral devices;

a plurality of computer connection ports for connecting to a plurality of computers;

a first port;

a second port; and

a control device coupled to the set of peripheral device ports, the computer connection ports, the first port and the second port, the control device repeatedly detecting whether the first port is occupied to repeatedly determine a master or slave status of the computer switch, wherein

if the first port is occupied, the control device determines the computer switch to be a slave and communicates data and commands between the first port and the plurality of computer connection ports, and

if the first port is unoccupied, the control device determines the computer switch to be a master and communicates data and commands between the set of peripheral device ports and the plurality of computer connection ports.

**7**. The computer switch of claim **6**, wherein if the control device determines the computer switch to be a slave, it further communicates data and commands between the first port and the second port.

**8**. The computer switch of claim **6**, wherein if the control device determines the computer switch to be a master, it further communicates data and commands between the set of peripheral device ports and the second port.

**9**. The computer switch of claim **6**, wherein if the control device determines the computer switch to be a master, the computer switch controls a slave computer switch connected to the second port of the computer switch and obtains data from the slave computer switch.

**10**. The computer switch of claim **6**, wherein if the control device determines the computer switch to be a slave, it configures a series number of the computer switch into a slave series number based on information regarding a series connection sequence received from the first port.

**11**. The computer switch of claim **6**, wherein if the control device determines the computer switch to be a master, it configures a series number of the computer switch into a master series number.

**12**. The computer switch of claim **10**, wherein the control device repeatedly detects the information regarding the series connection sequence from the first port and reconfigures its series number if the series connection sequence has changed.

**13**. The computer switch of claim **11**, wherein the control device repeatedly detects information received from the second port to determine whether a new slave is added.

**14**. A method executed by a computer switch, the computer switch having a set of peripheral device ports for connecting to a set of peripheral devices, a plurality of computer connection ports for connecting to a plurality of computers, a first port, and a second port, the method comprising:

repeatedly detecting whether the first port is occupied to repeatedly determine a master or slave status of the computer switch;

if the first port is occupied, determining the computer switch to be a slave and communicating data and commands between the first port and the plurality of computer connection ports; and

if the first port is unoccupied, determining the computer switch to be a master and communicating data and commands between the set of peripheral device ports and the plurality of computer connection ports.

**15**. The method of claim **14**, further comprising:

if the computer switch is determined to be a slave, communicating data and commands between the first port and the second port.

**16**. The method claim **14**, further comprising:

if the computer switch is determined to be a master, communicating data and commands between the set of peripheral device ports and the second port.

**17**. The method of claim **14**, further comprising:

if the computer switch is determined to be a slave, configuring a series number of the computer switch into a slave series number based on information regarding a series connection sequence received from the first port.



**18**. The method of claim **14**, further comprising:

if the computer switch is determined to be a master, configuring a series number of the computer switch into a master series number.

**19**. The method of claim **17**, further comprising:

repeatedly detecting the information regarding the series connection sequence from the first port and reconfiguring the series number if the series connection sequence has changed.

**20**. The method of claim **18**, further comprising:

repeatedly detecting information received from the second port to determine whether a new slave has been added.

* * * * *

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(A)(7)(B)**

I hereby certify that this principal brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,991 words, according to the word-count function of the word processing system used to prepare the brief (Microsoft Word 2011).

Dated: April 27, 2018

/s/ Laurence M. Sandell
Laurence M. Sandell

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing and the addendum thereto with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the appellate CM/ECF system on April 27, 2018.

/s/ Laurence M. Sandell
Laurence M. Sandell